**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| RIVIERA BEACH POLICE PENSION FUND and CITY OF HIALEAH EMPLOYEES RETIREMENT SYSTEM, derivatively on behalf of RESIDEO TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL G. NEFKENS, JOSEPH D. RAGAN III, NICCOLO DE MASI, PAUL DENINGER, ROGER FRADIN, JACK LAZAR, NINA RICHARDSON, ANDREW TEICH, and SHARON WIENBAR, <br><br> Defendants, <br><br> and <br><br> RESIDEO TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Case No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Riviera Beach Police Pension Fund and City of Hialeah Employees Retirement System ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Resideo Technologies, Inc. ("Resideo" or the "Company"), file this Verified Shareholder Derivative Complaint against Individual Defendants Michael G. Nefkens, Joseph D. Ragan III, Niccolo de Masi, Paul Deninger, Roger Fradin, Jack Lazar, Nina Richardson, Andrew Teich, and Sharon Wienbar (collectively, the "Individual Defendants" and together with Resideo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Resideo, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and

1

violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for their complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of internal Resideo documents produced pursuant to Plaintiffs' books and records demand, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Resideo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Resideo's directors and officers from October 29, 2018 through the present (the "Relevant Period").

2.      Based in Austin, Texas, Resideo produces and distributes home comfort technology, including thermostats and air-conditioning products, Residential Thermal Solutions ("RTS") products, such as boilers and water heaters, and home security solutions, including sensors, video cameras, and security panels.

3.      Resideo was created in late 2018 as an amalgamation of various business units and products that were formerly part of Honeywell International Inc. ("Honeywell"), a multinational technology and manufacturing company that provides industrial products, aerospace systems, and engineering services, among other things. The resultant entity was "spun off" from Honeywell as a standalone company and began trading publicly on the New York Stock Exchange ("NYSE") on

October 29, 2018 (the "Spin-Off"). In connection with the Spin-Off, over 65 million Resideo shares were sold for over $1.4 billion.

4.      Beginning shortly before the Spin-Off, and continuing throughout the Relevant Period, the Individual Defendants continually extolled the Company's business prospects to the investing public, making detailed statements about the Company's operations and product offerings, and representing that Resideo was well-prepared to establish itself in the market as an independent company.

5.      For instance, during a conference call with analysts and investors held on October 11, 2018, only several weeks before the completion of the Spin-Off, the Company's then-Chief Executive Officer ("CEO"), Defendant Michael G. Nefkens ("Nefkens") stated the following regarding Resideo:

> We have great growth prospects, and we are the leader right now in connecting a lot of the stuff in the home that no one sees, like water heaters, boiler controls, leak detection, and we have the scale and capability to innovate and be a major player in this space.

6.      The Individual Defendants continued to tout the Company's prospects over the course of the next year, representing, among other things, that (1) each of the Company's Products & Solutions business units, including the Company's RTS business and thermostats business, occupied a leading position in their respective markets; (2) the Company had begun the rollout of new, cutting edge products to significant customers such as ADT Inc. ("ADT"), the largest security company in the U.S.; and (3) the Company was accelerating the development of new, potentially lucrative products, which would further enhance the growth of the Company's business segments.

7.      However, the Individual Defendants' optimistic representations scarcely reflected the Company's true condition. From the moment Resideo began its life as a standalone entity, the

Company faced staggering problems at practically every level of its operations. Such problems included the following:

    (a)    the Company had few to no value engineers, i.e., expert personnel needed to control the costs of certain components such as raw materials, packaging, and electrical components, as practically all of the Company's value engineering teams had been siphoned off by Honeywell prior to the Spin-Off;

    (b)    the Company faced numerous problems with its supply chains and inventory, resulting in backorders and severe product shortages. These problems were in part caused by Resideo's lack of value engineers, and by the fact that the Spin-Off had substantially reduced the Company's manufacturing capabilities;

    (c)    certain of the Company's security products, as well as the Company's T-Series line of thermostats, which made up the core of the Company's residential thermostats portfolio, were rapidly becoming obsolete in the face of competing products that made use of more modern technology;

    (d)    the Company's Total Connected Comfort application (the "TCC App"), which allows users to interface with T-Series thermostats and other types of thermostats, was plagued by crashes, service outages, and other serious problems;

    (e)    the Company faced contract penalties and related costs associated with the Company's failure to deliver on contracts with certain Original Equipment Manufacturers ("OEM"), including ADT;

    (f)    as a result of the Spin-Off, the Company lost all of the advantages that had come with operating as a part of a multinational conglomerate such as Honeywell,

including loss of access to Honeywell's considerable bargaining power and profitable economies of scale;

(g)     the Company lacked the personnel, expertise, or technology to rectify any of the above-described problems, or to make good on promises made to investors by the Individual Defendants regarding the Company's products that were then in development, including "Project GRIP," a next-generation security platform, and "Project STORM," a systems integration tool; and

(h)     the Company lacked overall cohesion and faced integral governance and operational problems stemming from Resideo's nature as an amalgamation of largely disparate, unrelated business segments that lacked a shared operating history. This also had the effect of making it more difficult for management to reasonably predict the Company's future earnings or prospects.

8.     Moreover, the Spin-Off itself was specifically calculated to benefit Honeywell at the expense of Resideo. In connection with the Spin-Off, Resideo was required to (1) indemnify Honeywell for up to $140 million annually of Honeywell's asbestos-related environmental liabilities; (2) pay Honeywell a one-time, debt-funded dividend of approximately $1.2 billion; and (3) pay Honeywell tens of millions of dollars annually in royalties stemming from Resideo's use of Honeywell's various trademarks. Each of these liabilities would heavily impair Resideo's ability to innovate and operate effectively in a rapidly changing market—a fact that would have been highly material to potential investors.

9.     As the Individual Defendants' later representations would indicate, the Individual Defendants were well aware of the magnitude of these problems since the Company's inception, yet purposefully concealed them from the public.

10.     The truth began to emerge gradually, beginning in March 2019, when the Company reduced its 2019 financial guidance, and revealed a 20% decrease in profit in its Product & Solutions segment, which was purportedly impacted by "one-time spin-related costs."

11.     On this news, the price of the Company's stock dropped from $24.75 per share at the close of trading on March 6, 2019, to close at $18.96 per share on March 7, 2019.

12.     Subsequently, on August 7, 2019, the Company revealed further disappointing results, including a 36% drop in the Company's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), supposedly caused by "margin pressures due to product mix headwinds," among other things.

13.     On this news, the price of the Company's stock dropped to $17.08 per share at the close of trading on August 8, 2019, down from $17.50 per share at market open that day. The Company's stock price continued to fall over the course of the next several trading days, sinking to $16.45 per share at the close of trading on August 9, 2019, and then to $15.59 per share at the close of trading on August 12, 2019, the following trading day.

14.     Shortly afterward, on August 12, 2019, Oppenheimer published an analyst report lowering its price target for the Company and revealing that Resideo's management had "acknowledged that there is a 'new normal' in security and margins should settle in 500bps lower," which conflicted with the Individual Defendants' prior representations as to the benefits that purportedly soon-to-be launched products such as Project GRIP would provide for the Company.

15.     On the issuance of this report, the Company's stock price sank from $15.59 per share at the close of trading on August 12, 2019, to $15.31 per share at the close of trading on August 13, 2019, and continued to decline to $14.64 per share at the close of trading on August 14, 2019.

16.     Then, after the close of trading on October 22, 2019, the Company disclosed additional lower than expected financial results, including declining sales of non-connected thermostats. The Individual Defendants indicated, among other things, that "[w]e believe a poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line impacted the adoption of mid-level T-Series thermostats. The cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued."

17.     That same day, the Company revealed, stunningly, that the Company's Chief Financial Officer ("CFO"), Defendant Joseph D. Ragan III ("Ragan"), would be stepping down "to pursue other opportunities." The Company announced that Defendant Ragan would be succeeded by non-party Robert Ryder ("Ryder"), who would serve as the Company's interim CFO.

18.     On this news, the Company's stock price plunged by over 37%, falling from $15.23 per share at the close of trading on October 22, 2019, to $9.50 per share at the close of trading on October 23, 2019.

19.     At last, on November 7, 2019, during an earnings call held to discuss the Company's meager earnings for the third quarter of 2019, Defendant Nefkens revealed, for the first time, certain of the factors that had contributed to the Company's dismaying financial results—and which the Individual Defendants had repeatedly concealed throughout the Relevant Period—as follows:

> The first factor was gross margin compression. Most of our value engineering stopped prior to our spin-off from Honeywell. In a company like ours, product costs like components, raw materials and packaging need to be optimized every year to keep gross margin strong. Value engineering teams do that. Before we spun off from Honeywell, these teams were largely depleted, and we are seeing the effects of that in our gross margins" and that seeing any benefit from an effort to rebuild those teams would "take 12 to 24 months.

\* \* \*

The second factor is sourcing. We lost some sourcing leverage in direct and indirect materials following the spin-off. We've been working with our suppliers for several months now to rectify that.

\* \* \*

The third factor is a margin drop associated with the competitive renewal of a contract from a large OEM security customer. This contract was secured in 2017 and first deliveries began a year later, with volume ramp-up in 2019. Contractual customer rebates associated with this contract drove further margin decline this year.

\* \* \*

The fourth factor is the previously mentioned T-Series thermostat transition. This was a transition that began in 2017 from a high-margin product offering to more modern but lower-margin series.

\* \* \*

Finally, post-spin inventory write-downs and slow-moving products impacted our EBITDA as well.

20.     On this news, the price of the Company's stock fell once more, from $10.02 per share at the close of trading on November 6, 2019, to $9.78 per share at the close of trading on November 7, 2019, on heavy volume. The Company's stock price continued to decline over the course of the next several trading days, sinking to $9.60 per share at the close of trading on November 8, 2019, and finally settling at $8.77 per share at close on November 12, 2019.

21.     In total, from the time of the Spin Off on October 29, 2018, when the Company's shares closed at $25.82 per share, to November 12, 2019, when the Company's shares closed at $8.77 per share, the Company's stock declined **66%** in value, costing Resideo investors over **$2 billion** in market cap loss.

22.     Only a few weeks later, on December 2, 2019, Resideo announced that Defendant Nefkens would be resigning from his position as the Company's CEO.

23.     In the following months, new information continued to emerge, shedding further light on the Individual Defendants' numerous misrepresentations and omissions.

8

24.    For instance, during a conference call held on December 11, 2019, Ryder, the Company's new interim CFO, revealed new facts concerning the Company's dysfunctional operations that the Individual Defendants had concealed from the public throughout the Relevant Period. Ryder indicated that he learned of Resideo's numerous problems shortly after he was appointed interim CFO, and upon becoming aware of such problems, he immediately reduced the Company's full year guidance "by like 35%." Among other things, Ryder commented on the poor integration of Resideo's business segments, stating:

> A big thing was a lack of pre-existing standalone business . . . [e]ssentially, the whole Products & Solutions business was various businesses within divisions of Honeywell. And they kind of picked individual pieces up and kind of threw them together and called that Products & Solutions which we'll talk about. And that kind of had some governance ramifications.

25.    Additionally, during a conference call held on February 27, 2020, the Company's lead director, Defendant Andrew Teich ("Teich") revealed yet more information indicating that the Individual Defendants were aware that the Company lacked both value engineers and talented engineers generally throughout the Relevant Period, noting that following the Spin-Off, "there was an opportunity for talent improvement in the product development areas of P&S [Products and Solutions], and some of the lack of that was manifested in our results in 2019. So the problem has been identified."

26.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the negative impacts of the Spin-Off on Resideo were far more significant and

pervasive than the Individual Defendants had disclosed, and the royalties and other payments the

Company was required to make to Honeywell would significantly hamper the Company's ability

to operate effectively and respond to challenges in the market; (2) the Company had virtually no

value engineers, which would prevent the Company from effectively managing certain product

costs; (3) the Company's supply chains and inventory were pervaded by serious problems, causing

backorders and shortages; (4) the Company's T-Series thermostats and certain of its security

systems made use of outdated technology and were becoming less relevant in the market; (5) the

Company's TCC App was plagued by technical problems that reduced its effectiveness; (6) the

Company failed to fulfill contractual obligations to certain of its OEM customers, resulting in

contract penalties; (7) the Company had lost a significant amount of leverage and bargaining power

that it had once been afforded as a part of Honeywell; (8) the Company suffered from fundamental

governance and operational issues owing to its nature as a fusion of largely unrelated business

units without a shared history of operations; (9) the Company lacked the expertise or technology

needed to redress the foregoing problems; (10) due to all of the foregoing, the Individual

Defendants' representations regarding the Company's financial guidance, earnings, and overall

prospects were misleading and lacked a reasonable basis in fact; and (11) the Company failed to

maintain internal controls.   As a result of the foregoing, Resideo's public statements were

materially false and misleading at all relevant times.

27.     The Individual Defendants also breached their fiduciary duties by failing to correct

and/or causing the Company to fail to correct these false and misleading statements and omissions

of material fact.  Indeed, internal documents produced by Resideo in connection with Plaintiffs'

books and records request served pursuant to Section 220 of the Delaware General Corporation

Law demonstrate that the Company's Board was well aware of many of the issues plaguing the Company.

28.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

29.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's former CEO, the Company's former CFO, and the Company's former President, Products & Solutions and Chief Innovation Officer ("CIO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Minnesota (the "Securities Class Action").[1]  On March 30, 2021, the Court denied in full the defendants' motion to dismiss, exposing Resideo to significant liability and legal expenses. The Individual Defendants' breaches of fiduciary duty have also necessitated internal investigations and subjected the company to, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, costing the Company millions of dollars.

30.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

31.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority

---

[1] *In re Resideo Technologies, Inc. Securities Litigation*, No. 19-cv-2863 (D. Minn.).

of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act of 1933 and the Exchange Act.

33.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

34.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Resideo is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.  Further, Defendants have consented in writing to waive the provision in Resideo's Certificate of Incorporation providing that the Delaware Court of Chancery is the sole and exclusive forum for any derivative action brought on behalf of the Company.

## PARTIES

### Plaintiffs

36.     Plaintiff Riviera Beach Police Pension Fund is a current shareholder of Resideo. Plaintiff has continuously held Resideo common stock since the Spin-Off.

37.     Plaintiff City of Hialeah Employees Retirement System is a current shareholder of Resideo. Plaintiff has continuously held Resideo common stock since the Spin-Off.

**Nominal Defendant Resideo**

38.     Resideo is a Delaware corporation with its principal executive offices at 901 E 6th Street, Austin, Texas 78702. Resideo's shares trade on the NYSE under the ticker symbol "REZI."

**Defendant Nefkens**

39.     Defendant Nefkens served as the Company's CEO and President from 2018 until he resigned on May 27, 2020. According to the Company's Schedule 14A filed with the SEC on April 24, 2020 (the "2020 Proxy Statement), as of April 15, 2020, Defendant Nefkens beneficially owned 135,486 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Nefkens owned approximately $682,849 worth of Resideo stock.

40.     For the fiscal year ended December 31, 2019, Defendant Nefkens received $6,353,165 in compensation from the Company. This included $895,068 in salary, $2,866,654 in stock awards, $1,433,333 in option awards, $655,200 in non-equity incentive plan compensation, and $502,910 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Nefkens received $5,433,958 in compensation from the Company. This included $135,385 in salary, a $193,227 bonus, $4,104,724 in stock awards, $998,977 in non-equity incentive plan compensation, and $1,645 in all other compensation.

41.     The 2020 Proxy Statement stated the following about Defendant Nefkens:

Prior to joining Resideo, Mr. Nefkens served as the president and chief executive officer of Honeywell's Homes Business since May 2018 and has served as a member of the Board since the Spin-Off. Mr. Nefkens served as executive vice president and general manager of Regions & Industries at DXC Technology Company from April 2017 to February 2018. Mr. Nefkens served as executive vice president and general manager of Enterprise Services at Hewlett Packard Enterprise

Company from November 2015 to April 2017. Prior to that, Mr. Nefkens performed a similar role at Hewlett-Packard Co. ("HP Co.") from December 2012 to November 2015, having been appointed to the role in an acting capacity in August 2012. Previously, Mr. Nefkens served as senior vice president and general manager of Enterprise Services in the EMEA region at HP Co. from November 2009 to August 2012. Mr. Nefkens received his bachelor's degree in finance from Texas Christian University and his M.B.A. from Duke University's Fuqua School of Business. He served as a director of Riverbed Technology, Inc. from September 2014 to April 2015.

**Defendant Ragan**

42.     Defendant Ragan served as the Company's CFO from 2018 until he stepped down on November 6, 2019. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Ragan beneficially owned 13,222 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Ragan owned approximately $66,638 worth of Resideo stock.

43.     For the fiscal year ended December 31, 2019, Defendant Ragan received $1,958,301 in compensation from the Company. This included $492,885 in salary, $733,310 in stock awards, $366,662 in option awards, and $365,444 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Ragan received $1,337,101 in compensation from the Company. This included $84,615 in salary, a $44,090 bonus, $1,050,108 in stock awards, $156,237 in non-equity incentive plan compensation, and $2,051 in all other compensation.

44.     The Company's Schedule 14A filed with the SEC on April 25, 2019 (the "2019 Proxy Statement") stated the following about Defendant Ragan:

Prior to joining the Company, Mr. Ragan served as chief financial officer of Honeywell Homes since August 2018. From May 2013 to July 2018, he served as chief financial officer of Ferroglobe PLC and Globe Specialty Metals, Inc. (which combined with Grupo FerroAtlántica, S.A. in 2015 to form Ferroglobe PLC.). Prior to that, he served as chief financial officer of Boart Longyear Limited from 2008 to 2013. Before his civilian career, Mr. Ragan was a U.S. Army military intelligence officer. He was a licensed certified public accountant in the State of Virginia for over 20 years and trained as a CPA with Deloitte & Touche LLP. Mr. Ragan

received his bachelor's degree in accounting from the University of the State of New York and his master's degree in accounting from George Mason University.

**Defendant de Masi**

45.     Defendant Niccolo de Masi ("de Masi") served as the Company's CIO from February 2019 until his employment with the Company was terminated on March 13, 2020. He also served as the Company's President, Products & Solutions and as a Company director from February 2019 and October 2018, respectively, until he resigned from those positions on January 6, 2020. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant de Masi beneficially owned 64,738 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant de Masi owned approximately $326,279 worth of Resideo stock.

46.     For the fiscal year ended December 31, 2019, Defendant de Masi received $4,010,936 in compensation from the Company. This included $589,931 in salary, $1,807,938 in stock awards, $903,980 in option awards, $345,938 in non-equity incentive plan compensation, and $363,149 in all other compensation.

47.     The 2019 Proxy Statement stated the following about Defendant de Masi:

Mr. de Masi has been the President, Products and Solutions and Chief Innovation Officer at Resideo since February 2019. He has been a member of Resideo's Board since October 2018. Mr. de Masi has been a member of the board of directors of Glu Mobile, Inc. since January 2010, and has served as chairman since December 2014, as interim chairman from July 2014 to December 2014 and as president and chief executive officer from January 2010 to November 2016. Mr. de Masi also served as the president of Essential Products, Inc., a mobile phone hardware company, from November 2016 to October 2018. Mr. de Masi received his B.A. and M.A. degrees in physics from Cambridge University. Mr. de Masi previously served as a director of Xura, Inc. from November 2015 until its sale in August 2016.

**Defendant Deninger**

48.     Defendant Paul Deninger ("Deninger") has served as a Company director since 2018. He also serves as the Chair of the Company's Finance Committee, and as a member of the Audit Committee and the Innovation and Technology Committee. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Deninger beneficially owned 11,377 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Deninger owned approximately $57,340 worth of Resideo stock.

49.     For the fiscal year ended December 31, 2019, Defendant Deninger received $234,999 in compensation from the Company, which included $115,000 in fees earned or paid in cash and $119,999 in stock awards.

50.     The 2020 Proxy Statement stated the following about Defendant Deninger:

> Mr. Deninger served as a senior advisor to Evercore Inc., a publicly held investment banking advisory firm, from June 2016 to February 2020. Mr. Deninger served as a senior managing director with Evercore from February 2011 to June 2016. From December 2003 until October 2010, Mr. Deninger served as a vice chairman at Jefferies Group LLC, a wholly-owned subsidiary of Jefferies Financial Group Inc., a diversified financial services company. Prior to that, he served as chairman and chief executive officer of Broadview International LLC, a mergers and acquisitions advisory firm focused on the technology industry. Mr. Deninger received his B.S. from Boston College and his M.B.A. from Harvard Business School.

**Defendant Fradin**

51.     Defendant Roger Fradin ("Fradin") has served as the Chairman of the Board since 2018. He also serves as a member of the Company's Finance Committee and the Innovation and Technology Committee. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Fradin beneficially owned 64,039 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Fradin owned approximately $322,756 worth of Resideo stock.

52.     For the fiscal year ended December 31, 2019, Defendant Fradin received $394,999 in compensation from the Company, which included $275,000 in fees earned or paid in cash and $119,999 in stock awards.

53.     The 2020 Proxy Statement stated the following about Defendant Fradin:

Mr. Fradin joined Honeywell in 2000 when Honeywell acquired Pittway Corporation, where he served as president and chief executive officer of the Security and Fire Solutions segment. Mr. Fradin served as president and chief executive officer of Honeywell's Automation and Control Solutions business from January 2004 to April 2014 and served as vice chairman of Honeywell from April 2014 to February 2017. Mr. Fradin served as an independent contractor to Honeywell from March 2018 to September 2018. He has also served as an operating executive with The Carlyle Group since 2016 and an advisor to Seal Rock Partners since 2014. Mr. Fradin received his M.B.A. and B.S. degrees from The Wharton School at the University of Pennsylvania. While a student at Wharton, Mr. Fradin also served as a member of its faculty from 1976 to 1977. He previously served as a director of MSC Industrial Direct (1998-January 2020) and Pitney Bowes (2012-2019).

**Defendant Lazar**

54.     Defendant Jack Lazar ("Lazar") has served as a Company director since 2018. He also serves as the Chair of the Company's Audit Committee, and as a member of the Innovation and Technology Committee and the Strategic & Operational Committee. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Lazar beneficially owned 36,386 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Lazar owned approximately $183,385 worth of Resideo stock.

55.     For the fiscal year ended December 31, 2019, Defendant Lazar received $240,821 in compensation from the Company, which included $120,822 in fees earned or paid in cash and $119,999 in stock awards.

56.     The 2020 Proxy Statement stated the following about Defendant Lazar:

Mr. Lazar has been an independent business consultant since March 2016. From January 2014 to March 2016, he served as the chief financial officer of GoPro, Inc., a provider of wearable and mountable capture devices. From January 2013 to January 2014, he was an independent business consultant. From May 2011 to January 2013, Mr. Lazar served as senior vice president, corporate development and general manager of Qualcomm Atheros, Inc., a developer of communications semiconductor solutions. Mr. Lazar is a certified public accountant (inactive) and received his B.S. degree in commerce with an emphasis in accounting from Santa Clara University. He previously served as a director at TubeMogul, Inc. (2013-2016) and Quantenna Communications (2016-2019).

### Defendant Richardson

57.     Defendant Nina Richardson ("Richardson") has served as a Company director since 2018. She also serves as the Chair of the Company's Nominating and Governance Committee, and as a member of the Compensation Committee and the Strategic & Operational Committee. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Richardson beneficially owned 16,297 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Richardson owned approximately $82,136 worth of Resideo stock.

58.     For the fiscal year ended December 31, 2019, Defendant Richardson received $228,321 in compensation from the Company, which included $108,322 in fees earned or paid in cash and $119,999 in stock awards.

59.     The 2020 Proxy Statement stated the following about Defendant Richardson:

Ms. Richardson serves as managing director of Three Rivers Energy, Inc., a company she co-founded in 2004, and has been an independent consultant since March 2015. From February 2013 to February 2015, Ms. Richardson served as

chief operating officer of GoPro, Inc. She has also held several executive positions of increasing responsibility at Flextronics, Inc., a global electronics and manufacturing service provider. Ms. Richardson received her B.S. degree in industrial engineering from Purdue University and an executive M.B.A. from Pepperdine University. She previously served as a director at Zayo Group Holdings, Inc. (2015-2018), Callidus Software, Inc. (2017-2018) and Silicon Graphics International Corp. (2016).

**Defendant Teich**

60.     Defendant Teich has served as the Company's lead independent director since 2018. He also serves as the Chair of the Company's Innovation and Technology Committee and the Strategic & Operational Committee, and as a member of the Compensation Committee, the Finance committee, and the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Teich beneficially owned 68,375 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Teich owned approximately $344,610 worth of Resideo stock.

61.     For the fiscal year ended December 31, 2019, Defendant Teich received $424,906 in compensation from the Company, which included $172,089 in fees earned or paid in cash and $252,817 in stock awards.

62.     The 2020 Proxy Statement stated the following about Defendant Teich:

Mr. Teich has been a private technology consultant since June 2017. From May 2013 until June 2017, he served as the chief executive officer and president of FLIR Systems, Inc., a public multinational imaging and sensing company, and a director from July 2013 to June 2017. Mr. Teich joined FLIR Systems, Inc. in 1999 and held various positions of increasing responsibility within the company including president of the Commercial Systems, Commercial Vision Systems and Thermography divisions throughout his tenure. Mr. Teich received his B.S. degree in marketing from Arizona State University and is an alumnus of the Harvard Business School Advanced Management Program.

**Defendant Wienbar**

63.     Defendant Sharon Wienbar ("Wienbar") has served as a Company director since 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 15, 2020, Defendant Wienbar beneficially owned 16,277 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2020 was $5.04, Defendant Wienbar owned approximately $82,036 worth of Resideo stock.

64.     For the fiscal year ended December 31, 2019, Defendant Wienbar received $239,999 in compensation from the Company, which included $120,000 in fees earned or paid in cash and $119,999 in stock awards.

65.     The 2020 Proxy Statement stated the following about Defendant Wienbar:

Ms. Wienbar was chief executive officer of Hackbright Academy, a technology training firm, from 2015 to 2016. From 2007 to 2015, she served as a partner at Scale Venture Partners, a technology and healthcare venture capital firm. Ms. Wienbar received her A.B. and A.M. degrees in engineering from Harvard University and her M.B.A. from Stanford University. She previously served on Microsoft Inc.'s venture advisory committee and as a director of Everyday Health, Inc. (2007-2016) and Glu Mobile, Inc. (2004-2008).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66.     By reason of their positions as officers, directors, and/or fiduciaries of Resideo and because of their ability to control the business and corporate affairs of Resideo, the Individual Defendants owed Resideo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Resideo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Resideo and its shareholders so as to benefit all shareholders equally.

67.     Each director and officer of the Company owes to Resideo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Resideo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.     To discharge their duties, the officers and directors of Resideo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Resideo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Resideo's Board at all relevant times.

71.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of Resideo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Resideo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Resideo's own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Resideo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Resideo and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Resideo's operations would comply with all applicable laws and Resideo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to Resideo and the shareholders the duty of loyalty requiring that each favor Resideo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Resideo and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with Resideo, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Resideo.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants who is a director of Resideo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Resideo, and was at all times acting within the course and scope of such agency.

## RESIDEO'S CODE OF CONDUCT

82. The Company's Code of Conduct provides that "[w]e expect our employees to adhere to both the letter and spirit of this Code."

83. In a section titled, "A Manager's Role," the Code of Conduct states the following, in relevant part:

> Our managers, supervisors and leaders should serve as role models for ethical business conduct. The bigger the role an employee occupies, the more we expect of them when it comes to modeling the right behavior and promoting compliance with our values and policies. We expect our managers to drive our culture of integrity, including:
>
> - demonstrating ethical leadership through their words and actions
>
> - ensuring that employees understand our Code and how the principles found in the Code apply to their jobs
>
> * * *

- identifying and communicating to the Integrity and Compliance Team any areas where our compliance policies and procedures need to be strengthened

* * *

- promptly escalating suspected violations of our Code so that they can be investigated

84.     In a section titled, "Protect Company Resources," the Code of Conduct states the following:

> Appropriate use of Resideo resources is critical to our success. Among other things, employees must:
>
> - safeguard Resideo property against loss, theft, or misuse, including unauthorized use
>
> - ensure that business expenditures comply with Resideo policies and procedures including the Resideo Schedule of Executive Authority
>
> - not use Resideo's name, facilities, or relationships for personal benefit or for the benefit of a third-party

85.     In a section titled, "Win Business Openly and Honestly," the Code of Conduct states the following:

> We win business by being open and honest and providing quality products and services. Resideo operates in many countries around the world. While the customs and cultures may vary from one place to another, Resideo's fundamental approach to winning business is to build strong and lasting relationships with our customers by providing them with high quality products and services and always operating from a strong foundation of honesty and trust. No matter where you are in the world working on Resideo's behalf, acting at all times with integrity is the best way to build the types of long-lasting customer relationships that lead to sustained business success.

86.     In a section titled, "Market Truthfully and Accurately," the Code of Conduct states the following:

> When we tell the world about our products and services, we must ensure that we are truthful and accurate in our advertising, product packaging, marketing or sales materials, and that we do not mislead our consumers. This is also true when we make statements about our competitors or comparisons between our competitors' products and ours.

87.    In a section titled, "Keep Honest, Accurate Books and Records," the Code of

Conduct states the following:

> As a publicly traded U.S. company, Resideo must comply with securities laws that
> require Resideo to disclose accurate and complete material information regarding
> its business, financial condition and results of operations. We must always work to
> ensure that our financial reporting and disclosures are full, fair, accurate, timely and
> understandable. This includes complying with all financial internal controls and
> raising any concerns about the accuracy of our records.
>
> In addition to ensuring the integrity of financial records, we expect employees to
> make sure that all other company information is recorded and reported accurately.
> This includes, but is not limited to, information concerning the company's
> employees, research and development activities, strategic plans, travel and expense
> claims, and general operations.

88.    In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse

of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the

Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to

maintain the accuracy of Company records and reports, comply with laws and regulations, conduct

business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

89.    Resideo is a global provider of home comfort and security solutions for residential

spaces. The Company purports to provide its products, including heating, ventilation, and air-

conditioning ("HVAC") devices, RTS products, video cameras, sensors, and other security

products, and more to over 150 million homes worldwide. The Company's operations are carried

out by its Products & Solutions ("P&S") segment, which oversees operations relating to the

Company's HVAC, RTS, and home security products, and the Company's ADI Global Distribution Segment ("ADI") which handles distribution of the Company's security and fire protection products.

90.     Resideo was initially cobbled together from a number of Honeywell's business segments, including portions of Honeywell's Home and Building Technologies business and its Safety and Productivity Solutions business.

91.     Honeywell is a diversified technology and manufacturing conglomerate with operations spanning the globe. Among other things, Honeywell develops and provides aerospace products and services, electronics and advanced materials, specialty chemicals, petrochemical refining technology, and productivity and security technologies for buildings and industries.

**The Spin-Off and Resideo's Ensuing Obligations to Honeywell**

92.     The entity that would become Resideo began to take shape in October 2017, when Honeywell announced plans to spin-off its Homes and Global Distribution business segment. During this period, Honeywell was also in the process of spinning off several of its other business segments into standalone companies, including its Resins & Chemicals segment and its transportation business. In part, Honeywell conducted these spin-offs so that the company could rid itself of billions of dollars of legacy asbestos-related liabilities by causing its spun-off businesses to indemnify Honeywell for portions of the liabilities.

93.     In connection with the Spin-Off, which would proceed without an initial public offering, Honeywell registered Resideo's stock under Section 12(g) of the Exchange Act, which only required Resideo to file a Form 10 registration statement, rather than a Form S-1. Resideo's initial Form 10 was filed on August 23, 2018, and was amended on October 2, 2018, as described in more detail below.

94.     On October 14, 2018, about a year after the Spin-Off was announced, Honeywell entered into an indemnification agreement with Resideo in connection with Honeywell's asbestos-related liabilities. The agreement obligated Resideo to reimburse Honeywell for 90% of amounts related to Honeywell's legacy asbestos liabilities, including environmental claims and remediations, as well as toxic tort claims related to exposure to asbestos. Such reimbursements would be capped at $140 million per year, and would continue until 2043, unless the amount of Honeywell's liabilities falls below $23 million for three years in a row.

95.     On October 19, 2018, Resideo entered into a 40-year trademark agreement with Honeywell. Under the terms of the agreement, Resideo is required to pay to Honeywell, in the form of royalties, 1.5% of the proceeds of any Honeywell Home products Resideo sells. The trademark agreement remains a material source of expenditures for Resideo—for instance, during 2019, the Company paid Honeywell $27 million in royalties pursuant to the agreement.

96.     Furthermore, in connection with the Spin-Off, Honeywell required Resideo to make a one-time "dividend payment" to Honeywell in the amount of $1.2 billion. In order to make the payment, the Company entered into an $800 million loan, and assumed $400 million in senior unsecured notes.

97.     The debt and other obligations that Resideo was saddled with pursuant to the above-described indemnification agreement, trademark agreement, and "dividend payment" to Honeywell meant that it was of paramount importance that the Company be run smoothly and effectively following the Spin-Off in order to turn a profit. Unfortunately, and as described in more detail below, the Company's operations were anything but smooth and effective.

**Resideo's Extensive, Undisclosed Problems**

98.   From the moment that the Company's stock began trading publicly on October 29, 2018, Resideo faced a huge number of fundamental, companywide problems touching practically every part of the Company's business and operations.

99.   For starters, the Company as a whole was constructed from disparate, generally underperforming Honeywell business segments that had no common history of operating together, resulting in a shaky foundation and systemic governance problems.

100.   Specifically, in order to create Resideo, Honeywell spun off portions of its Environmental & Energy Solutions, Honeywell Security & Fire, Honeywell Building Solutions, ADI, Safety Solutions, and Productivity Solutions business units. However, only the ADI business unit was fully passed on to Resideo—Honeywell retained parts of each of the other five units, which continue to operate as part of Honeywell today, and even compete with certain of Resideo's business units.

101.   As described herein, shortly after his appointment as the Company's interim CFO, Ryder revealed that the Company's business structure was essentially a hodgepodge of "individual pieces" that had been thrown together and were not optimized to function as part of a smaller business such as Resideo. Ryder stated the following, in relevant part:

> A big thing was a lack of pre-existing standalone business . . . [e]ssentially, the whole Products & Solutions business was various businesses within divisions of Honeywell. And they kind of picked individual pieces up and kind of threw them together and called that Products & Solutions which we'll talk about. ***And that kind of had some governance ramifications***.
>
> * * *
>
> We probably have too many [products], we might be in too many places. Maybe our manufacturing facilities aren't in the right places with the right freight lanes. Maybe capacity utilization isn't where we would want to be.
>
> * * *

We're going to make some pretty sizeable reductions in [selling, general and administrative expenses] to right-size the business for what we think new sales will be when we eliminate some of the [products] and maybe look at some of the geographies and make sure we have the right [selling, general and administrative expenses], because all this stuff came over from Honeywell, and was probably structured for a much bigger, more complex business. Which we no longer have. There is a lot of governance with a clear escalation path.

(Emphasis added).

102. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████ █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

103. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████

█████████████████████████

██████████████████████████████████████████

---

[2] References to "RES-DER____" are to confidential documents produced by Resideo to Plaintiffs in connection with a books and records demand to the Company made pursuant to Section 220 of the Delaware General Corporation Law.



104.     Another significant problem faced by the Company was its lack of value engineers. For each of the business units Honeywell spun off to Resideo, Honeywell retained its dedicated value engineering teams, which left Resideo without an effective means of controlling the costs of electrical components, packaging, and other raw materials. As Defendant Nefkens would eventually admit, it would take the Company "12 to 24 months" to build up new value engineering teams with expertise specific to the Company and its operations.

105.     The Company's dearth of value engineers also had a negative impact on the Company's supply chains, which were already hindered by the loss of Honeywell's manufacturing resources following the Spin-Off. The result was that Resideo's supply chain operations were in a

state of substantial disorder even before the completion of the Spin-Off, leading to backorders, inventory shortages, and the loss of customers. According to a former Company sales representative cited to in the Securities Class Action,[3] who worked at Resideo until February 2019, certain of the Company's products would be on backorder for weeks on end, and the severity of this problem began to increase during the beginning of 2019. A former distribution representative who worked at Resideo from October 2018 until June 2019 corroborated these representations, stating that the Company's supply chain issues grew progressively worse after the Spin-Off, resulting in backorders for months, and numerous customer complaints.

106.    Resideo's loss of access to Honeywell's resources following the Spin-Off also meant that Resideo would no longer receive the benefits of the substantial leverage and negotiating power that Honeywell was afforded as a giant, multinational conglomerate. This included Honeywell's ability to negotiate favorable deals for raw materials, as well as certain financial arrangements.

107.    Yet another issue plaguing the Company was the series of technical problems facing the Company's TCC App, which provides the user interface for 30 to 40 different varieties of Resideo's internet app-controlled, or "connected" thermostats. According to a former Company program manager who worked at Resideo from October 2018 through Spring 2019, by the summer of 2018, the TCC App was nearing the threshold of users that it could support without experiencing crashes and service outages. The threshold was ultimately reached in November 2018, resulting in weekly outages and numerous customer complaints, many of which were discussed by Company employees with the Company's Chief Technology Officer, non-party Edgar Tu ("Tu"). According

---

[3] Information regarding the former Company employees and confidential witnesses cited to in the Securities Class Action is derived from the Consolidated Amended Complaint filed in the Securities Class Action on April 10, 2020.

to the former Company program manager, in December 2018, Company employees were instructed by Tu not to discuss the issues with the TCC App outside of the group of employees working to rectify the issues. The former Company program manager indicated that the Company's senior leadership, including at least Defendants Nefkens and de Masi, were likely aware of the problems with the TCC App.

108.    The Company also faced problems related to its widely touted "Project GRIP," a control panel designed to integrate various security systems and sensors into one platform. One version of Project GRIP was being specifically designed for use by ADT, one of the Company's biggest customers, and the Company was contractually obligated to provide to ADT its version of Project GRIP before the general consumer version was released. However, Project GRIP faced significant delays, which threatened the relationship between the Company and ADT. According to a former Company software developer, who worked at Resideo from October 2018 through March 2019, by February 2019, the Company had only sent ADT a beta version of Project GRIP, which was supposed to have been ready for rollout in February 2019. The former Company software developer noted that due to such delays, the Company incurred millions of dollars in contract penalties pursuant to its contract with ADT, and likely lost millions of dollars in revenue by failing to timely rollout Project GRIP to the market.

109.    Another purported Company project facing significant setbacks was the Company's Project STORM, a systems integration tool that would purportedly "integrate all dimensions of home wellness." According to the former Company software developer, Project STORM was essentially a fake project, and at the time the former software developer left the Company in March 2019, the technology needed to complete the project was years away from being developed. According to a former Company program manager, employees repeatedly

expressed concerns to senior Company employees, including Defendant de Masi, that the deadlines Company management had set for the completion of the project could not be met. These statements were corroborated by a former channel marketing manager, who noted that Defendant de Masi and other members of Company management attended a meeting in either December 2018 or January 2019, during which the problems with Project STORM were discussed, and Company engineers advised that the technology needed to complete the project had not yet been developed.

110.    According to the former Company software developer, during a Company meeting around January 2019, non-party Scott Harkins, a Company vice president, ordered Company employees in attendance to only communicate about the problems with Project Storm and the Company's TCC App through WhatsApp.com, so that emails about such potentially damaging information could not leak to the public. The former Company software developer noted that this order came down from the Company's leadership team, which likely meant Defendants Nefkens and Ragan, and possibly the Board as well.

111.    The Company's core T-Series line of thermostats was also plagued by technology-related issues. Specifically, the T-Series thermostats were composed of various aging technologies that were already approaching obsolescence before the Spin-Off. Similarly, certain of the Company's security products which had formerly been sold by Honeywell also made use of outdated technology and were lagging behind competing products that incorporated more cutting edge technology. The former Company software developer represented that the market for aging, non-connected thermostats, which Resideo and Honeywell historically dominated, was continually shrinking, and the Company had no path forward to compete with more advanced thermostats and security products in the market. The former software developer noted that these challenges were

discussed at a Company meeting around January 2019, during which the possibility of Resideo losing channel partners who sell its thermostats and security systems was discussed extensively.

112.    Additionally, the former Company software developer stated that "Flycatcher," the internal name for the new T9 and T10 models in the T-Series line released in 2019, was approximately 18 months late to the market due to a lack of sufficiently talented software developers and product engineers at Resideo. The former software developer also noted that the T9 and T10 models did not possess superior range as compared to competing products, contrary to certain of the Individual Defendants' representations.

113.    Due to all of the foregoing problems, it was practically impossible for Resideo to meet the financial guidance issued by the Company during the Relevant Period. Despite this, the Individual Defendants continually reaffirmed the Company's guidance and repeatedly touted the Company's prospects to the investing public.

**Additional Information Illustrating that the Individual Defendants Were Aware of the Problems Plaguing Resideo**

114.    Since well before the Spin-Off, and continuing throughout the Relevant Period, the Individual Defendants were well aware of the multitude of serious issues pertaining to Resideo's products, governance, operations, and overall business prospects.

115.    Defendant Nefkens in particular, by virtue of his role as CEO, and because of his former position as CEO of Honeywell Homes, would have been acutely aware of the governance, products, supply chain, and other issues plaguing the Company since before the Spin-Off. ██ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ Both Defendants Nefkens and Ragan repeatedly discussed in detail with investors the Company's earnings, its new

products, its supply chains, and its issues related to the Spin-Off throughout the Relevant Period. Defendants Nefkens and Ragan were hands-on leaders with direct access to all of the data and information regarding the Company's prospects and the material issues plaguing the Company, and as such they clearly would have been aware that the representations they made were false and misleading.

116.



117.     Moreover, additional statements made by certain of the confidential witnesses cited to in the Securities Class Action further evidence the Individual Defendants' awareness of the

extent of the Company's various problems, and their complicity in concealing such problems from the public.

118.    For example, a former general manager who worked at the Company from before the Spin-Off until 2019, and who reported to Defendant Nefkens on an interim basis, recalled multiple meetings attended by Defendants Nefkens and Ragan during which issues with the Company's supply chain and product delays were discussed, as well as the root causes for reduced profits in certain of the Company's business units, including its RTS unit.

119.    A former cloud software engineer who worked at the Company from November 2018 through June 2019, and worked on software for Project GRIP, indicated that the Company's senior leadership were likely aware that Project GRIP would not ship on time, as such issues were discussed in daily meetings.

120.    A former global program manager who worked at Resideo from October 2018 through June 2019 stated that by at least May 2018—when the Company was required to extend certain contracts that had previously been entered into by Honeywell before the Spin-Off—it would have been obvious to Resideo's leadership that the Company could no longer win contracts on as favorable terms without Honeywell's leverage and influence.

121.    Additionally, the sudden departure of Defendants Nefkens and Ragan following the Company's unfavorable disclosures in late October 2019 and early November 2019 gives rise to a strong inference that the Individual Defendants had determined by that point that it had become clear to the public that the Company had issued false and misleading statements, and so a change in management was required. Ryder's disclosures too, and the speed and relative ease at which Ryder uncovered the truth as to the Company's underlying problems following his appointment,

also illustrate the substantial likelihood that the Individual Defendants were aware of the Company's true state but chose to conceal it from the market.

**The Individual Defendants Conditioned the Market Prior to the Spin-Off**

***August 23, 2018 Presentation***

122.     On August 23, 2018, Honeywell posted a presentation on its website titled, "Resideo At A Glance," which described Resideo's purported strengths, among other things, prior to Resideo's Spin-Off from Honeywell. The presentation listed Defendants Nefkens, Ragan, and Fradin under the heading, "Leadership," indicating that the statements made in the presentation were Defendants Nefkens, Ragan, and Fradin's representations.

123.     Under the heading, "Company Snapshot," the presentation described Resideo as follows:

> Leading global provider of critical comfort and security solutions, primarily in residential environments

> Leading global wholesale distributor of security and low voltage products

> Innovative solutions protected by broad intellectual property portfolio

> 40-year licensing agreement to use Honeywell Home brand

> $4.5B company, leader in the Internet of Things for residential market

124.     Under the heading, "Competitive Strengths," the presentation represented that Resideo possessed the following attributes:

> Diversified revenue streams, strong segment profits and limited capital expenditure needs

> Deep expertise in technology for the home, regulatory standards, user experience, and certification

> Agility and speed to market needed to move in a growing industry

> Strong management operating system and attractive financial profile

Proven management team with transaction and technology experience

125.    Additionally, under the heading, "What We Do," the presentation stated the following:

> Our broad portfolio provides innovative, end-to-end solutions across Comfort and Care and Security and Safety for the home, solving multiple customer needs. Our growing portfolio of connected home solutions is one of the largest and most comprehensive in the market.

### October 2, 2018 Form 10-12B/A and Information Statement

126.    On October 2, 2018, the Company filed with the SEC an amended registration statement on Form 10-12B/A in connection with Resideo's Spin-Off. The amended registration statement included as an attachment a preliminary information statement (the "Information Statement") that described in detail Resideo's business and operations, the purported reasons behind the Spin-Off, and Resideo's purportedly grandiose prospects. The cover page to the Information Statement contained an introduction signed by Defendant Nefkens, which stated the following, in relevant part:

> Thank you for your interest in Resideo, Honeywell's planned spin company that is focused on technology for the residential homeowner. We understand that a house is the biggest investment most of us will ever make. While technology makes it possible to have a home that is smarter, more energy efficient, more secure, and easier to control, consumers face overwhelming choices when it comes to modernizing their home. We believe there's a great opportunity for a company like Resideo to offer simple solutions to connect the systems and accessories that make a home smart.
>
> When we launch Resideo as a standalone, publicly traded company, we will be uniquely positioned to lead the global smart home market for four key reasons:
>
> 1)    We are a global leader in professionally installed residential comfort and security and the leading global wholesale distributor of security and low voltage products. We delivered more than $4.5 billion of sales in 2017, and that size allows us to achieve economies of scale in production, distribution and speed to market, while maintaining our status as the partner of choice in the smart home ecosystem. As a standalone company, we will be agile

enough to respond to our dynamic markets and well-positioned to make strategic investments in our future.

2) We have a long-term agreement with Honeywell to license the Honeywell Home brand. That is an important ingredient to our success, but also an important recognition of our heritage. Resideo begins with more than 100 years of domain knowledge and expertise connecting the home. The Honeywell brand is in more than 150 million homes and reflects decades of trust built with dealers and installers, and a promise of reliability for consumers. More than one-third of our product sales come from connected devices, which unlock data to provide millions of consumers with better insights along with peace of mind knowing technology is making their home a better place to live.

3) We expect to benefit from major trends influencing consumer decisions around the globe. There are expected to be about 75 billion connected devices globally by 2025, up from just 20 billion in 2017. We currently have approximately 4.7 million connected customers and more than 30 million sensor points – and we expect these numbers to grow rapidly.

4) Our customers include professional contractors, service provider partners, and those who prefer to do it themselves (DIY). They want a smart home that integrates seamlessly, with devices that are compatible regardless of who manufactured them. This is why our products work effectively with the most widely used home automation systems – Amazon Alexa™, Apple HomeKit™, Google Home™, and Samsung SmartThings™. Our commitment to working well with others makes us an attractive and highly sought-after partner – in fact, it's why we currently have 3,000 third party developers creating mobile apps to integrate with our solutions.

We are excited about the company Resideo will be on Day 1 and the ways we intend to advance the smart home industry in the years to come. We are passionate about improving lives around the globe through leading home technologies. We have assembled a world-class team of talent to lead Resideo with the know-how to make our spin successful. The attached information statement details our strategy and plans for near and long-term growth to generate value for our shareowners.

127. In a section titled, "Our Company," the Information Statement described Resideo

and its product offerings as follows, in relevant part:

We are a leading global provider of critical comfort and security solutions primarily in residential environments, with a presence in over 150 million homes globally. Our products, which benefit from the trusted, well-established Honeywell brand, are installed in over 15 million homes annually, allowing SpinCo to launch innovative technologies and services at scale. After the Spin-Off, these products will be marketed and sold under the Honeywell Home brand pursuant to a 40 year

license agreement with Honeywell. ***We have a long-standing leadership position in the traditional/non-connected products space that contributes significantly to our net sales. Our growing portfolio of connected home solutions is one of the largest and most comprehensive in the market***. Our connected solutions are supported by software ***platforms (which we expect to consolidate in a single platform and mobile application)*** that allow consumers and channel partners to easily install, use and maintain our solutions and third party devices. These platforms interact with other ecosystems to control SpinCo's and others' home automation devices. Over 4.7 million of our customers are connected, providing access to control, monitoring and alerts, and we have approximately 30 million installed sensors generating more than 250 billion data transmissions annually. Our broad portfolio of innovative products is supported by approximately 3,000 worldwide active and pending patents, delivered through a comprehensive network of over 110,000 professional contractors, more than 3,000 distributors and over 1,200 original equipment manufacturers ("OEMs"), as well as major retailers and online merchants.

Our ADI Global Distribution business ("ADI") is the leading wholesale distributor of security products, and is independently recognized for superior customer service. Through over 200 stocking locations in 17 countries, ADI distributes more than 350,000 products from over 1,000 manufacturers to a customer base of over 100,000 contractors. We believe this global footprint gives us distinct scale and network advantages in our core products over our competitors. Further, we believe our customers derive great value from the advice and recommendations of our knowledgeable design specialists allowing our customers to better meet the technical and systems integration expertise requirements to install and service professional security systems. We continue to transform the industry with value-added services such as presales system design and 24/7 order pick-up, and the selective introduction of new product categories such as professional audio visual. Additionally, ***ADI has long been an important channel to market for our security products, providing a level of end-customer intimacy that drives our ability to develop successful new products at an accelerated rate and insights into current market trends that help us quickly adapt our product portfolio to meet evolving customer needs***. Similarly, ADI is an important channel to market for third party manufacturers, whose products represent a significant majority of ADI's net sales.

We intend to expand and market our extensive portfolio and distribution base in several ways. We view our long-standing, mutually beneficial relationships with professional contractors and OEM channels as a key differentiator in our Products segment and plan to continue to invest in and grow with these channel partners. We believe the global connected home market is in the early stages of broad consumer adoption, with Gartner projecting the installed base of "connected things" in the consumer segment to grow from approximately four billion in 2016 to more than 12 billion in 2020 and we intend to expand our connected solutions and services offerings to capitalize on this trend. We also intend to expand ADI's geographic

footprint, product categories and services to drive overall sales, including SpinCo's security products business.

(Emphasis added.)

128.     The Information Statement also provided that Resideo is "strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security and work together to contribute to a connected home ecosystem."

129.     In a section titled, "History of Innovation," the Information Statement stated the following, in relevant part:

> ***We have a long history of innovation and industry firsts in our Comfort & Care and Security & Safety markets and have a reputation for providing trusted, tested and proven products and solutions***. We trace some of our innovations as far back as the 1880s when we invented the predecessor to the modern thermostat. From the first clock thermostats to the world's first gas burner control, we have consistently driven progress and innovation in home comfort and security, including the introduction of the iconic T-86 "Round" thermostat in 1952. In 2000, we acquired the ADEMCO business, a leader in monitored burglary and fire alarm systems with roots back to 1929 and the early days of wired burglar alarms, expanding our presence in fire and security systems.

(Emphasis added.)

130.     In a section titled, "Our Strengths," the Information Statement stated the following, in relevant part:

> ***Our iconic Honeywell brand is globally recognized for quality, innovation, security and reliability***. Our products and solutions are present in over 150 million homes worldwide ***and we believe, based on management estimates, that we have the leading global market position in thermostats and residential security products and in security products distribution***. Our solutions are installed in more than 15 million homes annually, allowing SpinCo to launch innovative technologies and services at scale. Our leading position extends to our connected platform, where we currently have over 4.7 million connected customers and 30 million sensors generating over 250 billion data transmissions annually.
>
>                     * * *
>
> ***Our comprehensive Products portfolio provides end-to-end solutions that focus on critical needs within the home, where product reliability and ease of use are of utmost importance***. This portfolio is comprised of traditional product offerings

as well as a growing connected offering. Our deep domain expertise allows us to consistently provide trusted, tested and proven solutions that meet robust standards for cybersecurity and regulatory, as well as certification standards for devices addressing critical life safety needs. ***Our portfolio distinguishes us from our competitors, most of whom focus on niche solutions within the home. We provide solutions that address multiple consumer connected home needs under a common platform***. As new devices and use-cases emerge, we believe the continuing development of our common platform across devices and all levels of connectivity (device, software, cloud, analytics and consumer interface) will become vital to ensure a seamless and reliable experience. Our broad portfolio also enables us to achieve profitable economies of scale in production, distribution and speed to market while making us a "go to" partner in the smart home ecosystem. However, after the Spin-Off our economies of scale with respect to the Products segment may be diminished with respect to certain purchasing activities, such as IT infrastructure and other support services, as compared to when we were a part of Honeywell.

\* \* \*

Our broad suite of connected solutions allows end customers to use mobile apps to control their thermostats, security systems, cameras and home automation devices such as electronic locks, lights and garage doors. We currently service over 4.7 million connected customers and transmit over 40 million consumer notifications, including more than two million security panel signals, every day. Adoption rates of our connected home solutions in the future will depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. ***We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio***. We expect to benefit from the over 17% compound annual growth rate ("CAGR") projected by IDC for connected thermostats over the next five years. Beyond that, our expanding portfolio of self-installed and self-monitored solutions such as the Smart Home Security System and Lyric Cameras are well positioned to participate in the growth of DIY solutions unit sales which according to IHS are expected to grow at a rate of over 20% per year from 2015 through 2020. In security, we continue to see strong support for our professionally-installed and monitored solutions.

\* \* \*

***We believe we have an attractive financial profile highlighted by our diversified revenue streams, strong segment profits and limited capital expenditure needs. We have delivered strong net sales growth over the period from 2013 to 2017, during which our net sales grew at a CAGR of 3.7%.*** In addition, the overall nature of our business is not capital intensive. For the years 2015 to 2017, our capital expenditures averaged 1.3% of our net sales.

(Emphasis added.)

131.    In a section titled," Our Growth Strategies," the Information Statement stated the following, in relevant part:

*We are developing new, innovative products and solutions across Comfort & Care and Security & Safety to grow our core business and differentiate ourselves from our competitors*. Over the past three years, we have launched over 200 new products such as the Lyric family of connected home solutions, which includes thermostats, water leak detectors and awareness cameras. Our next generation alarm systems are expected to launch in late 2018. We have also launched cloud service offerings such as AlarmNet 360 and Total Connect 2.0 that allow consumers to control their systems remotely and contractors to provide efficient installation, maintenance and support services. *We plan to further expand our portfolio by bringing to market an extensive set of new solutions for everyday problems, including remote furnace and boiler monitoring, smart vents, shut-off valve solutions, battery-operated video motion cameras and a residential global intrusion system*. While we believe we are well positioned to capitalize on future trends and opportunities for innovation, the constantly evolving needs of our customers make it difficult to predict the pace or scope of future technological developments and our business may be affected if our new products or upgrades are not adopted by consumers.

* * *

*We believe we are well positioned to benefit from the growing demand for connected solutions in homes due to our breadth of offerings, customer reach and strong brand*. As consumer preferences drive increasing demand for connected home solutions, we believe our portfolio of end-to-end solutions will become increasingly important. Compelling connected home use cases require careful orchestration of multiple solutions to create an ecosystem that can be reliably accessed by consumers on a common platform. A seamless experience is a key differentiator relative to single-purpose product providers.

We plan to further enhance the customer value proposition by expanding remote functionality and real-time access to information and analytics that help the end-user control their home environment. We also intend to support this effort by extending our suite of proprietary service offerings as well as the range of options for controlling our devices in conjunction with third party systems. These innovations require that we navigate a complex and changing technological and regulatory landscape.

(Emphasis added.)

132.    The Information Statement also contained a discussion of the risks facing Resideo and its business, which described risks relating to the Spin-Off and other associated matters. These risk factors were largely generic, and failed to disclose any of the material issues regarding Resideo's business units, products, supply chains, and governance that had already occurred and were still occurring, stating the following:

> We have no operating history as an independent, publicly traded company, and our historical combined financial information is not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.
>
> We derived the historical combined financial information included in this Information Statement from Honeywell's consolidated financial statements, ***and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent, publicly traded company during the periods presented, or those that we will achieve in the future***. This is primarily because of the following factors:
>
> - Prior to the Spin-Off, we operated as part of Honeywell's broader corporate organization, and Honeywell performed various corporate functions for us. Our historical combined financial information reflects allocations of corporate expenses from Honeywell for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent publicly traded company.
>
> - We will enter into transactions with Honeywell that did not exist prior to the Spin-Off, such as Honeywell's provision of transition and other services and brand licensing agreements, and undertake indemnification obligations, which will cause us to incur new costs. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell."
>
> - Our historical combined financial information does not reflect changes that we expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our business. ***As part of Honeywell, we enjoyed certain benefits from Honeywell's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we may lose these benefits after the Spin-Off***. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses, or access capital markets on terms as favorable to us as those we obtained as part of Honeywell prior to the Spin-Off, and

our business, financial condition, results of operations and cash flows may be adversely affected. In addition, our historical combined financial data do not include an allocation of interest expense comparable to the interest expense we will incur as a result of the Reorganization Transactions and the Spin-Off, including interest expense in connection with the incurrence of indebtedness at the Company.

We have no operating history as an independent, publicly traded company. Furthermore, while the individualized businesses or their predecessors have a history of product development going back over 100 years, we have neither operated with a residential Comfort & Care, Security & Safety, or home solutions business focus, nor combined that with a distribution business in the past, and we may not be successful in continuing to operate and grow our business with a narrower focus and outside the broader Honeywell operating environment.

We may face operational inefficiencies as we continue to integrate our business after the Spin-Off. Following the Spin-Off, we will also face additional costs and demands on management's time associated with being an independent, publicly traded company, including costs and demands related to corporate governance, investor and public relations and public reporting. In addition, while we have been profitable as part of Honeywell, we cannot assure you that our profits will continue at a similar level when we are an independent, publicly traded company. For additional information about our past financial performance and the basis of presentation of our Combined Financial Statements, see "Selected Historical and Unaudited Pro Forma Combined Financial Data," "Unaudited Pro Forma Combined Financial Statements," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Combined Financial Statements, and the Notes thereto, included elsewhere in this Information Statement.

(Emphasis added.)

### October 10, 2018 Press Release

133.    On October 10, 2018, the Company issued a press release announcing an investor showcase to be held in New York City later that day. The press release quoted Defendant Nefkens, who stated the following, in relevant part:

"On this first anniversary of the spin-off announcement, Resideo is on the cusp of becoming a stand-alone, publicly traded company. We are ready to meet customer needs across every part of the home and at every point of the buyer's journey. From the vigilant security keeping watch on the exterior, iconic comfort products on the wall, smart controls behind the wall, and cloud-based mobile apps giving consumers greater control, Resideo will launch as a global leader with the know-

how to truly connect the home. We start with an unparalleled presence in 150 million homes and a 130-year history providing reliable solutions for the critical systems of a home. We are deepening our ties with the professionals who deliver comfort and security to homeowners, and have a long-term, exclusive license to use the globally recognized Honeywell Home brand. Our ADI global distribution business is already the leader in security distribution, and one of the leading reasons Honeywell residential products continue to be professionally installed 15 million times a year."

"Resideo begins with an enviable market position, as a $4.7 billion business with a global addressable market of more than $35 billion that continues to grow thanks to favorable trends and consumer preferences. ***Our diversified revenue streams, strong segment profits and limited capital expenditure needs are just a few of the reasons Resideo has a bright future***. We can't wait to see REZI listed on the NYSE."

(Emphasis added.)

### *October 10, 2018 Slide Presentation*

134.    Also on October 10, 2018, in advance of the Company's above-described investor showcase, the Company filed a current report on Form 8-K with the SEC including as an exhibit a slide presentation to be displayed during the showcase. Among other things, the slide presentation provided that the Company's products offered "[s]eamless control across connected product categories," and that the Company's connected home software "ties it all together."

135.    In a slide containing the caption, "Positioned to Drive Shareholder Value Well into the Future," the slide presentation also stated the following:

With Resideo:

We believe your home will anticipate and deliver your comfort and efficiency needs through our innovative smart home solutions installed by our professional channel partners

We Have:

- Winning track record with size, scale, and loyal customer base

- Leading positions integrating and running most critical systems in a home

- Well capitalized balance sheet

- Strong cash flow, liquidity and ability to grow business

- Profitable Top and Bottom Line Growth

136. Moreover, the slide presentation indicated that Resideo was expected to yield over 4% in organic revenue growth and would maintain an adjusted EBITDA margin of 13% pre-indemnity, and 10% post-indemnity.

137. As would later be revealed, the Company's business and financial prospects were nowhere near as optimistic as the above-referenced representations purported. However, the investing public would not learn the truth until long after the completion of the Spin-Off on October 29, 2018.

**Materially False and Misleading Statements During the Relevant Period**

*November 8, 2018 Form 8-K and Slide Presentation*

138. On November 8, 2018, less than two weeks after Resideo's common stock began trading on the NYSE, the Company filed a current report on Form 8-K with the SEC indicating that members of Resideo's management would attend the Robert W. Baird Global Industrial Conference in Chicago in order to give a presentation on the Company. The Form 8-K also included as an exhibit a slide presentation that contained the following graphic touting the Company's purportedly "mature, integrated" supply chain as follows:



139.    The attached slide presentation also provided the following graphic touting the

Company's purported "key growth drivers" and "diversified product portfolio" as follows:



***November 13, 2018 Press Release***

140.    On November 13, 2018, the Company issued a press release disclosing its financial

results for the fiscal quarter ended September 30, 2018. The press release provided the following

full-year fiscal 2018 guidance and fiscal 2019 outlook:

> The company today reaffirmed its guidance for full-year 2018 at the high end of
> the previously stated range. Resideo expects to realize net sales between
> $4.77 billion and $4.83 billion, pro forma adjusted EBITDA between $605 million
> and $615 million, and pro forma adjusted EBITDA including environmental
> indemnity between $465 million and $475 million.
>
> ***The company also reiterated its expectations for full-year 2019, including
> 4 percent organic revenue growth, adjusted EBITDA margin of 13 percent, or
> 10 percent after the indemnity payment to Honeywell***, and research and
> development investment of approximately $125 million. Resideo also plans to
> declare modest dividends in 2019, subject to Board approval.

(Emphasis added.)

141.    The press release also quoted Defendant Nefkens as follows:

> "Resideo had a solid third quarter as part of Honeywell, preceding a successfully
> executed spinoff," said Mike Nefkens, president and CEO of Resideo. "While our
> performance has already been released to the market through Honeywell's recent
> earnings as part of their broader segment disclosure, we're eager to take this next
> step as a public company by providing more detail through the earnings process.
> After listening to feedback from our investors, we've chosen to release our results
> the evening before our first earnings call to give investors time to review the
> numbers. We're looking forward to providing additional context around the quarter
> on our call tomorrow."
>
> "***Our performance as part of Honeywell over the past three years demonstrates
> a well-run business that is on-track to deliver continued growth in 2018 and
> beyond***," continued Nefkens. "Our first priority is to deliver results for our
> stakeholders, and we're inspired by the support and optimism of our customers and
> suppliers, 150 of whom we celebrated with as we rang the bell recently at the
> NYSE. As we see the demand for smarter homes on the rise, our long-standing and
> proven relationships with professional contractors – the 'do it for me channel'
> where the largest portion of our products are sold – make it much easier for
> consumers to upgrade to a home that is more efficient, safer, and easier to control.
> We have 130-years of expertise in homes through our Honeywell heritage, and a
> clear vision to deliver our next generation growth plan for Resideo. We're excited
> about our future and focused on creating value for our shareholders."

(Emphasis added.)

142.     The press release also purported that the Company had been impacted by "temporary supply chain issues" in connection with the Spinoff, stating the following:

> Products sales increased by 1 percent on a reported basis, and 2 percent on an organic basis, the difference being driven by the unfavorable impact of currency translation. ***Products segment performance was impacted by temporary supply chain issues as a result of the spin-off, which Resideo is actively resolving***. Products segment profit increased by 2 percent on a reported basis primarily due to a changing product mix, partially offset by inflation, net of productivity.

(Emphasis added.)

### *November 13, 2018 Form 10-Q*

143.     Also on November 13, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Ragan, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Nefkens and Ragan attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

144.     The 3Q18 10-Q stated the following regarding the Company's internal controls:

> Our Chief Executive Officer and Chief Financial Officer, with the assistance of other members of our management, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable assurance level as of the end of the period covered by this Quarterly Report on Form 10-Q.
>
> * * *
>
> There were no changes with respect to the Company's internal control over financial reporting or in other factors that materially affected, or are reasonably

likely to materially affect, internal control over financial reporting during the quarter ended September 30, 2018.

***November 14, 2018 Conference Call***

145.    On November 14, 2018, the Company hosted a conference call with investors and analysts to discuss the Company's financial results for the third quarter of 2018. During the call, Defendant Nefkens commented on "spin related supply chain issues" facing the Company, stating the following, in relevant part:

> As many of you have already heard from Honeywell on their Q3 earnings call we experienced some spin related supply chain issues that temporarily increased our backlog and additional spin related costs that negatively impacted our revenue and EBITDA for the quarter. ***We are actively addressing these supply chain issues and we're already seeing product flows moving back towards normal volumes. With the spin behind us operationally our team is focused and back on track.*** While we executed on the final phase of our spin we also garnered some key wins and continue to develop our product pipeline. As many of you know we have two segments in the company, a product segment and a distribution segment and finally we are excited about the momentum our business is showing and we're reaffirming our guidance for full year 2018 and outlook for 2019. We expect our full year 2018 results at the high end of the range, our performance as part of Honeywell over the past three years demonstrates a well-run business that is on track to deliver continued growth in 2018 and beyond. We are excited about our future and focused on continued growth and innovation to create value for our customers and shareholders.

(Emphasis added.)

146.    Additionally, Defendant Ragan referred to the supply chain challenges Resideo was facing as "short-term," and stated that "[o]ur business is performing well. And we expect the powerful combination of scale, steady growth and market position will give us margin expansion and significant equity valuation uplift going forward."

147.    Also during the call, the following exchange took place between Defendant Nefkens and an investor analyst on the subject of the Company's supply chain issues:

> [Analyst]: if you could give a breakout of how much of the growth was really impacted by spin related supply chain noise during the quarter, and then going

forward what do you view as a normalized growth rate, and how quickly can you get there? Thanks.

[Defendant Nefkens]: Thanks for the question. So – so yeah, so I'll talk a little bit about the spin related supply chain issues that we put out there because it did affect us in Q3 as expected. I talked about these at Investor Day. Typically what they are – are our items I will just give you a really good example *like most of them are believe or not are administrative items*. We had an example of customs related issues where paperwork comes in under the Honeywell name, Products needs to actually be come out the Resideo name, took a couple days to do that. *We also have some plant shifts that we're making in Europe as a result of the spin. So, these are just items that we knew, were in front of us, we plan for it*.

*In Q4 I can tell you right now we're already seeing volumes coming back to norma*l. And I've told the team and we're still looking out, there's still a few things we've got to make sure come through before we get clean. *So I would tell you we're still seeing a few of those headwinds here in Q4 as expected. And we'll be fully back and running here by Q1*. Again, the reason that we were able to – from our guidance at the top-end of the range is because we're already working through these items, and *we're very comfortable that we're on the other side of it now*.

[Analyst]: Okay, terrific. That's great. So, full power by the beginning of 2019?

[Defendant Nefkens]: *That's correct.*

(Emphasis added.)

148.    Lastly, Defendant Nefkens also remarked on how the Company stood out from its competitors, stating, "they don't have product solutions or connectivity that sits behind the wall, which is really the core of any smart home. That's what makes us different."

149.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

### *December 12, 2018 Imperial Capital Security Investor Conference*

150.    On December 12, 2018, Defendant Ragan attended the Imperial Capital Security Investor Conference in New York, where he gave a presentation on Resideo. During the conference, Defendant Ragan attempted to gloss over the Company's supply chain issues, stating, "We have done a significant amount of work on the factory rationalization. 10 years ago, there were 50 factories and somehow Michael got from 50 to 18 and doubled revenue, which is spectacular . . . the company is incredibly efficient from a manufacturing supply chain perspective."

151.    The statements referenced in ¶¶ 138-148 and 150 herein were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the negative impacts of the Spin-Off on Resideo were far more significant and pervasive than the Individual Defendants had disclosed, and the royalties and other payments the Company was required to make to Honeywell would significantly hamper the Company's ability to operate effectively and respond to challenges in the market; (2) the Company had virtually no value engineers, which would prevent the Company from effectively managing certain product costs; (3) the Company's supply chains and inventory were pervaded by serious problems, causing backorders and shortages; (4) the Company's T-Series thermostats and certain of its security systems made use of outdated technology and were becoming less relevant in the market; (5) the Company's TCC App was plagued by technical problems that reduced its effectiveness; (6) the Company failed to fulfill contractual obligations to certain of its OEM customers, resulting in contract penalties; (7) the Company had lost a significant amount of leverage and bargaining power that it had once been afforded as a part of Honeywell; (8) the Company suffered from fundamental governance and operational issues owing to its nature as a fusion of largely unrelated business units without a

shared history of operations; (9) the Company lacked the expertise or technology needed to redress the foregoing problems; (10) due to all of the foregoing, the Individual Defendants' representations regarding the Company's financial guidance, earnings, and overall prospects were misleading and lacked a reasonable basis in fact; and (11) the Company failed to maintain internal controls.  As a result of the foregoing, Resideo's public statements were materially false and misleading at all relevant times.

**The Truth Gradually Emerges as False and Misleading Statements Continue**

***March 7, 2019 Press Release***

152.    On March 7, 2019, the Company issued a press release disclosing its financial results for the fiscal quarter and full year ended December 31, 2018. The press release quoted Defendant Nefkens as follows:

> ***"We delivered strong performance for the fourth quarter and full year, despite the spin-related cost base coming in higher than expected,"*** said Mike Nefkens, president and CEO of Resideo. "I am proud of our team's accomplishments as we successfully executed the spin and met or exceeded financial expectations.
>
> "***The disruption from the spin is mostly behind us and we have a solid team in place that delivered great results in 2018, and we are ready to do even more***. As a newly independent company, we are establishing our roadmap for growth and long-term value creation.
>
> "This year is foundational for Resideo as we take critical steps near-term to further improve our cost base, invest to accelerate growth, increase margins and drive recurring revenues. We've brought on new talent to drive innovation and win market share in the growing residential IoT market by reimagining the smart home for contractors and consumers alike," Nefkens said.

(Emphasis added.)

153.    The press release also indicated that profits from the Company's Products and Solutions segment had "decreased 20 percent, impacted by one-time spin-related costs."

154.    The press release quoted Defendant Ragan, who described adjustments to the

Company's revenue guidance as follows:

> "We've demonstrated a disciplined approach to capital allocation and we will
> continue to maintain that discipline going forward. We are in a financially-strong
> position to prioritize growth capital and maintain a healthy balance sheet," said Joe
> Ragan, Resideo's executive vice president and chief financial officer. "Our
> investment program will be a critically important component to our strategy,
> enabling us to drive to higher growth rates and margins in the long-term. ***In
> parallel, we are launching an initiative to optimize our cost base.***
>
> ***"We have updated our 2019 revenue guidance from 4 percent to a range of 2 to
> 5 percent, which reflects moderating housing metrics, shifting portfolio mix –
> with a higher weighting of ADI and connected products – and increased growth
> investment for the future.*** Our plans to invest for growth and cost-optimization
> programs drive our updated 2019 Pro Forma Adjusted EBITDA projection in the
> range of $410 to $430 million. We are confident in Resideo's ability to gain market
> share in all of our segments and look forward to providing further detail on our
> value creation strategy at our inaugural investor and analyst meeting this summer,"
> said Ragan.

(Emphasis added.)

155.    Additionally, the press release described the Company's purported strategy over

the near term and the coming years as follows:

> Through its Vision 2023 strategy, the company will expand its core capabilities and
> partnerships to offer homeowners safer, more secure and healthier homes. Resideo
> is making $90 million in new growth investments in 2019 to capitalize on its
> existing installed base of 150 million homes and deepen ties with its network of
> 110,000 do-it-for-me professional contractors.
>
> Over the year ahead, Resideo will roll out next generation platforms in both its
> security and comfort divisions. In security, Resideo's Global Residential Intrusion
> Platform is extensible and brings enhanced software offerings. In comfort, Resideo
> is launching a pioneering platform with recurring services that integrate all
> dimensions of home wellness.
>
> The final core components of Vision 2023 are Resideo's ecosystem of homeowners
> and contractors, and the company's ability to leverage its scale for accretive growth.
> An innovative new digital portal will connect Resideo's community of consumers
> with do-it-for-me professional contractors, which the company expects to launch in
> the second half of 2019. Resideo also has established an ongoing strategic initiative

to identify and execute on tuck-in acquisitions and investments that accelerate recurring revenues, topline momentum and margin expansion.

* * *

Resideo has recently made progress on several business development initiatives. The company began customer deliveries of its next-generation security platform (Global Residential Intrusion Platform/GRIP) in December 2018.

(Emphasis added.)

156.    On this news, the price of the Company's stock fell from $24.75 per share at the close of trading on March 6, 2019, to $18.96 per share at the close of trading on March 7, 2019.

### March 7, 2019 Conference Call

157.    Also on March 7, 2019, the Company hosted a conference call with investors and analysts to discuss the Company's fourth quarter and full year financial results for 2018. During the call, Defendant Nefkens stated the following with respect to "disruption" from the Spin-Off:

I want to personally thank you for the valuable input, feedback and great ideas from all of you, which has influence [*sic*] the path forward for Resideo. ***I also feel really good that most of the disruption from the spin is now behind us and we have a solid team in place that delivered great results in 2018***. I'm really proud [of] the way the team finished the years.

***As I've shared in the past, this is my third spin and we are on schedule. And in some cases ahead of schedule when I compare to previous spins I've been part of***. Our first fiscal year end as a public company is a great time to not only share some of our key initiatives for the year ahead, but also outline Resideo's long-term vision which we're calling vision 2023.

* * *

As you guys know with the spin this effectively is the first time that we are having all of our costs under our control . . . ***[W]e're at a strategic inflection point. I would tell you that we are at or ahead of where I expect[ed] to be***.

(Emphasis added.)

158.     Also during the call, Defendant Nefkens stated, "our innovative product pipeline

and focus on doubling our high-margin recurring revenue stream will further solidify our existing

market leadership," and indicated the following with respect to the Company's GRIP product:

> The big item for us this year is going to be our security business. We have the
> rollout of our new Global Intrusion Platform, started in December. That rollout is
> progressing very, very well with our first customers. And for us to be at the top of
> the range, we're going to need very strong performance from our teams in [the]
> second half of the year in the – in GRIP.
>
> * * *
>
> our biggest investment is our – the rollout of our GRIP platform, that's the next-
> generation security platform, which is already rolling out [] we've got our largest
> customer that comes up first, then we have general market in the Americas and then
> we move to general market in Europe. We were not planning a European launch
> until 2020. We're accelerating that into 2019 as well. So we've got investment
> increases to make that happen. That's security.

159.     With respect to the Company's comfort division, Defendant Nefkens stated the

following:

> On the comfort side, as I said earlier, we've rolled out several great products, the
> T9 and the T10 that Ian mentioned earlier. But we are going to have a new platform
> launch that was planned for 2020. We're accelerating that into 2019. All this is done
> to do two things. Number one, it's to accelerate our growth, and number two, it's
> going to be the [both] platforms that are necessary for us to really push subscription
> services. Our older products did not have the capability to do that. They were
> multiple applications. This will all be under single app, and we'll be able to launch
> our first generation of subscription services, which will drive our recurring revenue
> north. So that is why we're accelerating these investments. Those investments are
> primarily in the product segment, and we'll also be executing, as I mentioned in my
> prepared remarks, a few tuck-in acquisitions as well to give us other IP and products
> that will help us bring those subscription services to market.

160.     Subsequently, on March 12, 2019, after Defendant Ragan and other members of the

Company's management met with Bank of America Merrill Lynch analysts, Merrill Lynch issued

an analyst report rating the Company as "BUY", and stating, "[f]ollowing yesterday's meetings,

we have greater confidence in REZI's ability to achieve, and most likely surpass, its revised 2019

adjusted EBITDA outlook of $410-$430mm (BofAML $429mm), which was reduced in the context of last week's 4Q18 earnings results."

### *March 18, 2019 Form 10-K*

161.    On March 18, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K").  The 2018 10-K was signed by Defendants Nefkens, Ragan, de Masi, Deninger, Fradin, Lazar, Richardson, Teich, and Wienbar, and contained SOX certifications signed by Defendant Nefkens and Ragan attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. █████████████████████████

███████████████████████████████████████████████████████

███████████████████████

162.    In a section titled, "Competitive Strengths," the 2018 10-K touted the Company's product portfolio and growth prospects, among other things, stating the following, in relevant part:

> Our comprehensive Products portfolio provides end-to-end solutions focusing on critical needs within the home, where product reliability and ease of use are of utmost importance. This portfolio is comprised of traditional product offerings as well as a growing connected offering. Our deep domain expertise allows us to consistently provide trusted, tested and proven solutions that meet standards for cybersecurity and regulatory, as well as certification standards for devices addressing critical life safety needs. Our brand product portfolio and distribution distinguishes us from our competitors, most of whom focus on niche solutions within the home. We provide solutions that address multiple consumer connected home needs under a common platform. As new devices and use-cases emerge, we believe the continuing development of our common platform across devices and all levels of connectivity (device, software, cloud, analytics and consumer interface) will become vital to ensure a seamless and reliable experience. Our extensive product portfolio also enables us to achieve profitable economies of scale in production, distribution and speed to market while making us a "go to" partner in the smart home ecosystem

Our innovation is supported by the Resideo User Experience design group, **which creates value by understanding and translating the needs of consumers and channel partners to develop intuitive, desirable and brand differentiated end-to-end experiences**. Our products are regularly recognized in professionally judged international design competitions and we have won the highly coveted iF Design Award, Red Dot Design Award and the IDEA Design Award over a dozen times since 2015.

\* \* \*

We have over 1,300 engineers creating innovative solutions in software centers of excellence located in Austin, Texas, Bengaluru and Madurai, India and other locations. Our deep domain expertise, proprietary technology and brands are protected by a combination of patents, trademarks, copyrights, trade secrets, non-disclosure agreements and contractual provisions. We have approximately 3,000 proprietary worldwide active patents and pending patent applications.

\* \* \*

Our financial performance is underpinned by our implementation of the Operating System ("OS"). OS is integral to our organization, and was founded on the lean and six sigma principles of continuous improvement in quality, delivery, cost, growth and innovation. We have continued to execute the OS model following the Spin-Off, resulting in improved manufacturing productivity, more rapid product innovation and increased cost efficiencies. Important parts of our supply chain are strategically positioned in low cost regions located in or near key markets, consistent with a strategy of optimizing our supply chain and reducing delivery times. We have extended OS concepts beyond lean manufacturing to our Global Distribution business, customer service and product development areas. We are applying these practices to develop global platforms to drive standardization for scale and cost efficiency, while incorporating key technologies and functionalities to drive speed and faster innovation for our contractor partners and end-user customers.

\* \* \*

Our broad suite of connected solutions allows end customers to control their thermostats, security systems, cameras and home automation devices such as electronic locks, lights and garage doors from our mobile applications. We currently service over 5.6 million connected customers, including more than two million security systems that are monitored for security and life safety events. Future adoption rates of our connected home solutions will depend on a number of factors, including development of competitive and attractive products and the cost to customers of installation of new solutions or upgrade or renovation from older connected platforms or products. **We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio. We expect to benefit from the over 15%**

*compound annual growth rate ("CAGR") projected by Navigant for connected thermostats over the next five years*. Beyond that, our expanding portfolio of self-installed and self-monitored solutions such as the Smart Home Security System and Lyric Cameras are well positioned to participate in the growth of DIY security unit sales which according to IHS are expected to grow at a CAGR of 15% from 2017 through 2022 (inclusive of analog/network bundles and standalone cameras). In security, we continue to see strong adoption of our professionally-installed and monitored solutions.

163.    The 2018 10-K also described the Company's relationships with certain OEMs, including ADT, stating the following:

We also have long-standing relationships with important OEMs and service providers such as ADT Security Services, United Technologies and A.O. Smith Corporation. A number of these relationships extend more than 25 years, including some spanning over 40 years. These deep partnerships are possible because OEMs value our design capabilities, innovation, domain expertise, supply chain capabilities and product quality, and our commitment to working with them to grow their businesses by way of the Resideo/Honeywell Home platform and suite of products.

164.    The 2018 10-K also described the various risk factors facing the Company, echoing many of the generic risks listed in Resideo's previously issued Information Statement:

We have limited operating history as an independent, publicly traded company, and our historical consolidated and combined financial information is not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.

We derived the historical combined financial information for periods prior to the Spin-Off included in this Form 10-K from Honeywell's consolidated financial statements, and *this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent, publicly traded company during the periods presented, or those that we will achieve in the future*. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Honeywell's broader corporate organization, and Honeywell performed various corporate functions for us. Our historical combined financial information prior to the Spin-Off reflects allocations of corporate expenses from Honeywell for these and similar functions. These allocations may not reflect the costs it will incur for similar services in the future as an independent publicly traded company.

- We have entered into transactions with Honeywell that did not exist prior to the Spin-Off, such as Honeywell's provision of transition and other services and brand licensing agreements, and have undertaken indemnification obligations, which will cause us to incur new costs. See Note 21. Commitments and Contingencies of Notes to Consolidated and Combined Financial Statements for more information.

- Our historical combined financial information prior to the Spin-Off does not reflect changes that we have or expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our business. ***As part of Honeywell, we enjoyed certain benefits from Honeywell's operating diversity, size, purchasing power, borrowing leverage and available capital for investments***. As an independent entity, we may be unable to purchase goods, services and technologies, such as computer software licenses, or access capital markets on terms as favorable to it as those obtained as part of Honeywell prior to the Spin-Off, and our business, financial condition, results of operations and cash flows may be adversely affected. In addition, our historical combined financial data does not include an allocation of interest expense comparable to the interest expense we will incur as a result of the Spin-Off, including interest expense in connection with the incurrence of indebtedness at our Company.

Furthermore, while the individualized businesses or their predecessors have a history of product development going back over 100 years, we have a limited operating history with a residential Comfort, RTS, Security, or home solutions business focus, or in combination with a distribution business, and we may not be successful in continuing to operate and grow our business with a narrower focus and outside the broader Honeywell operating environment. We may face operational inefficiencies as we continue to integrate our business after the Spin-Off. We are responsible for the additional costs and demands on management's time associated with being an independent, publicly traded company, including costs and demands related to corporate governance, investor and public relations and public reporting. In addition, while we have been profitable as part of Honeywell, we cannot assure you that our profits will continue at a similar level when we are an independent, publicly traded company. For additional information about our past financial performance and the basis of presentation of our Consolidated and Combined Financial Statements, see "Selected Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical Consolidated and Combined Financial Statements, and the Notes thereto, included elsewhere in this Form 10-K.

(Emphasis added.)

165.    The 2018 10-K also stated the following regarding the Company's internal controls:

During the fourth quarter of 2018, under the supervision and with the participation of our management, including our principal executive officers and principal financial officer, management planned and prepared for new controls implemented over new material agreements and new Company entity level controls, to support our financial reporting requirements and internal control over financial reporting. Management has not identified any other changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

166.

167.



***April 25, 2019 Proxy Statement***

168.    On April 25, 2019, the Company filed its 2019 Proxy Statement with the SEC. Defendants Nefkens, de Masi, Deninger, Fradin, Lazar, Richardson, Teich, and Wienbar solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

---

[4] Plaintiffs' allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

169.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[o]ur Code of Business Conduct applies equally to all of our directors, officers and employees, as well as those of our subsidiaries, affiliates and joint ventures."

170.    The 2019 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

171.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the negative impacts of the Spin-Off on Resideo were far more significant and pervasive than the Individual Defendants had disclosed, and the royalties and other payments the Company was required to make to Honeywell would significantly hamper the Company's ability to operate effectively and respond to challenges in the market; (2) the Company had virtually no value engineers, which would prevent the Company from effectively managing certain product costs; (3) the Company's supply chains and inventory were pervaded by serious problems, causing backorders and shortages; (4) the Company's T-Series thermostats and certain of its security systems made use of outdated technology and were becoming less relevant in the market; (5) the Company's TCC App was plagued by technical problems that reduced its effectiveness; (6) the Company failed to fulfill contractual obligations to certain of its OEM customers, resulting in contract penalties; (7) the Company had lost a significant amount of leverage and bargaining power that it had once been afforded as a part of Honeywell; (8) the Company suffered from fundamental governance and operational issues owing to its nature as a fusion of largely unrelated business units without a shared history of operations; (9) the Company lacked the expertise or technology needed to redress the foregoing problems; (10) due to all of the foregoing, the Individual Defendants' representations regarding the Company's financial guidance, earnings, and overall prospects were misleading and

lacked a reasonable basis in fact; and (11) the Company failed to maintain internal controls. As a result of the foregoing, Resideo's public statements were materially false and misleading at all relevant times.

### May 8, 2019 Press Release

172.    On May 8, 2019, the Company issued a press release disclosing its financial results for the fiscal quarter ended March 31, 2019. The press release provided the following financial guidance, quoting Defendant Ragan:

> Looking ahead to the second quarter, the company's investment programs, which have already begun and are on track, are expected to accelerate – particularly with its new comfort platform and supporting digital programs. The company continues to anticipate its EBITDA profile will be 40% weighted to the first half of 2019 and 60% weighted to the back half of the year as the company also executes on its cost reduction program.

> "As we invest in the business for growth, we are pleased with our cash generation. We remain disciplined in our approach to cash management, exiting the first quarter with zero drawn on our $350 million revolver," said Joe Ragan, executive vice president and chief financial officer. "We are on track with our previously announced cost reduction program and expect $50 million in annualized savings by 2020. With continued confidence in our ability to execute and positive first-quarter results, we are reiterating our full-year 2019 guidance to reflect revenue growth of 2-5% and Adjusted EBITDA at the upper end of the range of $410 to $430 million."

173.    The press release quoted Defendant Nefkens as follows:

> "We're off to a great start in 2019 with strong Q1 revenue performance in both our Global Distribution and Products & Solutions businesses. In Q1, our in-house innovation shined with the launch and strong sales volumes of our next generation pro security platform," said Mike Nefkens, president and CEO of Resideo. "In addition, we acquired Buoy Labs, expanding our pro offerings into water leak detection, a critical segment in whole home solutions. I'm proud of the progress we've made in executing both our investment plans and cost reduction programs, and I am confident we are driving significant value creation as we execute on our growth strategy."

174.    The press release also discussed certain of the Company's recent product offerings, including, ostensibly, the Company's Project GRIP, stating the following:

At the Consumer Electronics Show in January, Resideo announced its Honeywell Home™ T-Series Smart Thermostats – the T9 and T10 Pro – which feature wireless smart room sensors. Resideo offerings won multiple awards at CES, including a Consumer Technology Association award, and earned mentions in multiple "top pick" and "best of CES" coverage. In the first quarter, Resideo also announced the Honeywell Home™ SiXCOMBO detector, its first ever, two-way professionally installed and monitored wireless combination smoke, heat and carbon monoxide detector.

* * *

Resideo's new next-generation pro series security platform began rollout in Q1. This revolutionary platform delivers both entry-level security protection and scales to a fully integrated smart home security solution. It features new self-contained wireless panels, advanced encrypted sensing, and offers dealers one system for easy installation and support. The expanded lines of sensors and life safety devices are interchangeable across the entire platform to help reduce inventory and training cost, and user replaceable parts provide added convenience for consumers. Q1 was a strong quarter for Products & Solutions, demonstrating both core business innovation and global growth.

### *May 8, 2019 Form 10-Q*

175.    Also on May 8, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "1Q19 10-Q").  The 1Q19 10-Q was signed by Defendant Ragan and contained SOX certifications signed by Defendant Nefkens and Ragan attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. ███████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

176.    The 1Q19 10-Q stated the following regarding the Company's internal controls:

Our Chief Executive Officer and Chief Financial Officer, with the assistance of other members of our management, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our

disclosure controls and procedures are effective at a reasonable assurance level as of the end of the period covered by this Quarterly Report on Form 10-Q.

* * *

There was no change in our internal control over financial reporting that occurred during the quarter ended March 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We have implemented, and continue to refine, internal controls and key system functionality to enable the preparation of financial information related to the new lease standard (ASU No. 2016-02) upon adoption on January 1, 2019. There were no significant changes to our internal control over financial reporting due to the adoption of the new lease standard.

177.    The 1Q19 10-Q also provided that there had been no changes to the risk factors listed in the Company's 2018 10-K.

### May 9, 2019 Conference Call

178.    On May 9, 2019, the Company hosted a conference call with investors and analysts to discuss the Company's financial results for the first quarter of 2019. During the call, Defendant Ragan commented on the revisions to the Company's guidance as follows:

We've reiterated our guidance for growth in a range of 2% to 5% as we gather more visibility into 2019. As I mentioned, we are guiding to the upper end of the adjusted EBITDA range of $410 million to $430 million. As a point of clarity, when you look at our numbers, this adjusted EBITDA guidance includes our Honeywell reimbursement agreement payment, and that is how we expect to guide going forward. Our margin guidance is unchanged for the year at 8% or 11% when you strip out the Honeywell reimbursement agreement payment.

179.    Defendant Nefkens also commented on the Company's growth and purported progress as follows:

Next, in our comfort business, we celebrated the award-winning launch of multiple products at CES, including our T9 and T10 smart home thermostats. ***The product segment also saw tangible improvement in supply chain execution as we work through spin-related headwinds from the past two quarters***. And lastly, for product and solutions, adjusted EBITDA was $81 million, above first-quarter expectations, but down year over year with the new products launch mix headwinds combined with higher-than-planned product and solution overhead costs, which we're working on. Now turning to ADI, we saw a continued growth in our global distribution segment in the first quarter with business growing 6% on a constant-

currency basis. Growth was particularly solid in the Americas and EMEA and within our security and life safety businesses.

* * *

First, we had an outstanding start to the year in both our business segments with strong growth and performance above expectations on key metrics including adjusted EBITDA and adjusted EPS. Second, we're on track in executing our cost and investment programs, and combined, they're an essential piece in positioning us as a high-margin growth business over the long term. Third, our financial position is strong and our healthy balance sheet will allow us to drive our profitable growth strategy

And last, this is our third quarter under our belt post-spin. We're making progress in all areas, but we're being very measured to ensure progress. And we're going to walk before we run. So with that, for 2019, we're confident in our growth guidance in the upper end of our EBITDA guidance, and we remain optimistic.

* * *

***So net-net, a solid start to our investment initiatives and cost programs. We're also starting to move beyond some of the supply chain and cost spin burdens.*** We still have a long way to go to meet our goals of substantially high margin recurring revenue. However, the solid Q1 has given us a momentum as we continue our work toward our strategy to accelerate profitable growth.

(Emphasis added.)

180.   Defendant Nefkens commented on the Company's presence in the thermostats and

thermal solutions markets as follows:

Resideo has small presence in this space. Moving up to chart to our largest business of products and solutions, comfort. We have broken the down into four sub-segments. The first, connected thermostats, is a growing market at 10% plus, and we've been performing above market with multiple market gaining launches over the past 12 months, including the T9 and T10 smart home thermostats; next, is traditional temperature control, which includes non-connected thermostats, hydronic heating controls, zoning controls, etc. ***That's a $2.5 billion market where Resideo is the clear leader, but the market traditional temperature control is flat, and we're performing just about that.***

* * *

***And in RTS, Resideo has a strong and leading market position and growing well above market.*** So to summarize, Resideo has market-leading positions in performance in the markets we serve, coupled with solid Q1 improvements in our

pro security business. So our work is to gear Resideo to accelerate growth even further in these markets.

(Emphasis added.)

181.    With respect to the Company's GRIP product, Defendant Nefkens stated the following:

> So that's that. Now so obviously, there is seasonality involved in that and when it gets really cold and systems break, we have a much higher aftermarket sale, and that gives us a margin tailwind. The other point on the product mix point is really too important to note here, is also -- with the launch of our security platform to -- right now, which we're basically rolling out to one of our largest customers, that is an OEM-type contract. It has lower price points.
>
> So we're basically rolling that product at first at the lowest price points while we still have not come up the scale from a manufacturing perspective, and that's causing kind of the product mix area. So that's how you -- we're looking at product mix bucket. And as we continue to go faster, that's when we've increased the number there.

182.    Also during the call, the following exchange took place between an analyst and Defendant Nefkens regarding the time frame for the rollout of the Company's GRIP product and related products:

> [Analyst]: This is Jeff Kessler at Imperial Capital. Can you talk a little bit about -- beyond your largest customer on the security side when you're talking about putting together both a home product selection on the security side, as well as integrating heat and cold equipment. When you look at the next level down of companies or let's just call it both direct dealers, as well as channel partners, what are you finding as the sweet spot for what they want so that you can maximize -- to some extent, maximize your scale and margin, maximize what they want at their end to satisfy their end users the most? Where are you finding that compromised, that mix that would be maybe the sweet spot for growth in this company beyond the relationship with your largest buyer?
>
> [Defendant Nefkens]: Yes, Jeff. So thanks for the question. So obviously, we're really excited about the launch of our Pro series security product, and this product is redefining the industry with its self-contained wireless panel, its encryption, its sensing capability. I mean this is a true classic example of non-creepy type, right? So we're out listening to the customer.

We're not taking video. It's a true sensing product, and it's wireless, and very easy to use for the end user and very easy to install for the dealer. And it's got user replaceable modules, so they don't have to do a truck roll to get that up, which is going to save the dealer quite a bit of money going forward as technology upgrade. ***Now your question around the sweet spot for us, as we roll this out for the rest of our customers, being able to integrate, not only the hardware, but the hardware with our software, is going to be key for us, and then being able to leverage our platform to move into other adjacencies like the Buoy example that was just given. So we'll have the capability by the end of the year, beginning of next yea***r.

If you are using our application for security products, you're also going to be able to integrate the Buoy product and see what's happening with the water in your home, and we're going to be able to move into air quality as well. So that's why we're so excited about these platforms. That's why we're accelerating these platforms is because they give us more opportunity to grow our recurring revenue as we go forward.

(Emphasis added.)

183.    Defendant Nefkens also discussed the launch of certain of the Company's T-Series thermostats as follows:

This is a great example of Resideo leading through innovation in our core business segments. Next, in our comfort business, we celebrated the award-winning launch of multiple products at CES, including our T9 and T10 smart home thermostats. The product segment also saw tangible improvement in supply chain execution as we work through spin-related headwinds from the past two quarters. And lastly, for product and solutions, adjusted EBITDA was $81 million, above first-quarter expectations, but down year over year with the new products launch mix headwinds combined with higher-than-planned product and solution overhead costs, which we're working on.

184.    Subsequently, the following exchange took place between Defendants Nefkens and Ragan and an analyst on the subject of the Company's T-Series thermostats:

[Analyst]: It's Ian Zaffino from Oppenheimer. Question would be on kind of the margin evolution as we kind of progress through the year. You have this new security platform, I've got to believe you have a ton of cost absorption on that. Also, you're now selling, I guess, is it exclusively to one customer and as you diversify that, you could probably get high margin that way as well.

So kind of where we now as far as, maybe, the margin headwind that that's creating? And then what is the margins then ultimately look like or what are the margin

expansion should we be expecting as you ramp that product and you sell to nonexclusive partners?

[Defendant Ragan]: Thanks, Ian. The margin evolution over the years, as you saw it for the first quarter, is not much different for the entire year, as we just disclosed in the guidance. We will be seeing some progress on the new platforms that we put out, but at the same time, we are going to increase our investments significantly in Q2 and Q3. So from a profile perspective, we do have seasonality.

So Q1 was actually quite good. Q2 and Q3 are a little bit slower with the higher investment rates. ***And from the new products, we'll get additional scale throughout the year but for the whole year, we've got it to 8%, which is about what we did in Q1.***

[Analyst]: OK. And then you had a very successful launch of the T9 and T10 at CES. ***Now is that the super-connected thermostat? Or is this what's coming before and then you're going to have the super-connected coming afterwards? And what's kind of the timing of that rollout? Thanks.***

[Defendant Nefkens]: Yes. Ian, it's Mike here. So the T9 and T10 are top of the line connected products that have been in the works really for the last year. So -- and as you mentioned, we launched those very successfully at CES here in January.

The T9 is the -- kind of the do-it-yourself model, and the T10 is the pro model. ***So the thermostat we've been alluding to will be launching toward the second half of this year, and that will -- that is the super-connected one that's in the works right now. And we expect to be shipping those next year at the first of 2020.***

(Emphasis added.)

### *May 10, 2019 Investor Presentation Slides*

185.     On May 10, 2019, the Company published presentation slides on its website from its investor presentation held the prior day discussing the Company's results for the first quarter of 2019. The presentation described the following "key highlights" of the Company's performance that quarter:

- Strong growth in security driven by launch of next generation platform, with opportunity for margin improvement

- Award-winning launch at CES of new smart thermostat (T9/T10)

- Improvement in supply chain execution

- Margin compression due to mix headwinds

* * *

- Solid growth in the Americas and EMEA, and within Security and Life Safety product categories

- Enhancements in digital customer experience with launch of key upgrade to website

186.    The presentation also contained the following chart comparing the Company's growth estimates to those of its competitors:

## Resideo Segment and Market Overview

| | | | Addressable Market ($B)[2] | Market Growth Estimate (%)[1] | Est. Resideo vs. Market[4] | Select Players |
|---|---|---|---|---|---|---|
| Products & Solutions ($2.5B)[1] | Comfort $1.7B[1] | Connected Thermostats | $1.5B | +10% | Above Market | Nest (Google), Ecobee, tado, Hive, Emerson, GLAS (Johnson Controls) |
| | | Traditional Temperature Control | $2.5B | Flat to down | Above Market | Emerson, Lennox, Carrier, Trane |
| | | IAQ and Potable Water | $3.7B | 4-5% | At Parity | Aprilaire, BTW, Danfoss, Watts Water Tech, Carrier, Foobot, Awair, Molekule |
| | | Residential Thermal Solutions (RTS) | $2.7B | 2-3% | Above Market | SIT, ebmpast, Emerson, UTC |
| | Security $0.8B[1] | Pro Security[4] | $2.9B | 2-4% | At Parity | Alarm.com, Vivint, Simplisafe, Tyco, 2GIG, UTC, Ring, Nest Secure (Google), Abode |
| | | DIY Awareness | $2.3B | +10% | Below Market | Ring (Amazon), Nest (Google), Arlo, Ooma |
| ADI Distribution[5] $2.7B[1] | | | $20.6B | 3-4% | | Anixter, ScanSource |

Legend: Green = Above Market, Red = Below Market, Gray = At Parity

1. 2018 revenue as reported in our Annual Report on Form 10-K for the year ended December 31, 2018 filed with the Securities and Exchange Commission. 2. Includes intersegment revenue of $3.05B as reported in 10K; 3. Addressable market and growth rates for 2018 in the markets and geographies that we compete in. 4. Estimated Relative performance (rates E-over the past year; 5. Pro Security is professionally monitored security including those systems that are self-installed by consumers, e.g. Simplisafe; 6. ADI Distribution includes physical security equipment sold through distribution (video surveillance, access control, intruder alarms, video door phones, fire detection); Sources: IHS, Navigant, BSRIA, Management estimates

5

*Growing Presence in Attractive Markets*

resideo

*June 6, 2019 Robert W. Baird Global Consumer, Technology & Services Conference*

187.    On June 6, 2019, Defendant Ragan attended the Robert W. Baird Global Consumer, Technology & Services Conference. where he gave a presentation on Resideo. During the conference, Defendant Ragan stated the following with respect to Resideo's GRIP product, its contract with ADT, and its T-Series thermostats, stating the following:

We talked about the strong growth in Security. We won a large contract with ADT. And as we roll that out, we don't have the leverage yet on that particular product. That's our GRIP, Global Residential Intrusion Platform, that we rolled out and started to deliver this year. As we go through the year, we'll get margin expansion as we get additional volume and scale there.

\* \* \*

And the next-generation security platform is going great as far as the adoption. I'm sure everyone's seen the ADT commercials. That is our platform that they're highlighting there, and it is a great product.

\* \* \*

So we have made a move in connected thermostats. We were behind. We were #3 behind Ecobee and Nest, Now we're #2. So we are getting some momentum there. We rolled out a new connected thermostat, T9, T10, at CES, and that's gotten great adoption. That's clearly the best product in the market today which is driving some of that share growth we have.

\* \* \*

T9, T10 functionality is actually the best in the market.

188.  ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

189.    Additionally, Defendant Ragan represented that the Company has a "compelling position in the nonconnected [thermostat] space, much greater than 50%," and stated that though "comps year-over-year were tough," the declines in the Company's RTS business were "really just a temporary issue."

190.    That day, Whitesand Research published a report on the company, which stated the following:

> *We believe that the guidance cut (during 4Q18) is behind and REZI has laid out a path to accelerated growth following its 1Q19 earnings. The margins are also anticipated to rebound over the medium term*. REZI trades at ~7.3x our FY 2020 adjusted EBITDA estimate, which is at the lower end of the peer group *despite better margins and growth outlook*. In our view, REZI is undervalued at current levels.
>
> * * *
>
> The next generation security platform launched in late 2018 saw solid growth in 1Q19 as shipments began to one large customer. REZI expects the product to reach the entire customer base by 1H20 which should further drive revenue.

(Emphasis added.)

### *August 7, 2019 Press Release*

191.    On August 7, 2019, the Company issued a press release disclosing its financial results for the fiscal quarter ended June 30, 2019. The press release revealed, among other things, GAAP net loss of $11 million and GAAP earnings per share loss of $0.09 for the quarter. The press release stated the following regarding Resideo's performance during the quarter:

> Products & Solutions revenue increased by 4% on a GAAP basis, and 6% on a Non-GAAP constant currency basis year over year. Segment growth was driven by performance from the Security business with the migration to the new next-generation Pro Series security platform. *Segment EBITDA was down 36% as a result of unfavorable product mix, production cost increases, and the impact of acquisition expenses*. Negative impacts were partially offset by profit from increased volume, selling prices and raw material productivity.

(Emphasis added.)

192.    Despite these developments, the press release reaffirmed the Company's full year 2019 guidance of 2% to 5% revenue growth, and quoted Defendant Ragan as follows:

> "As we continue investing in our business to generate sustainable growth, our balance sheet remains strong, and we continue to be disciplined in our cash management approach," said Joe Ragan, executive vice president and chief financial officer. "Looking ahead, we expect third quarter revenue growth to be modest, driven by typical seasonality. We remain committed to our previously announced EBITDA guidance, supported by our cost reduction program, which is on track to yield $50 million in annualized savings by 2020."

193.    The press release also quoted Defendant Nefkens as follows:

"Our momentum continues with strong top-line growth during the second quarter, spread evenly across our ADI Global Distribution and Products & Solutions businesses," said Mike Nefkens, president and CEO of Resideo. "In the first half of the year, we launched several new products including the T9 and T10 smart thermostats and an industry-leading universal defrost control for heat pumps. We also completed acquisitions of LifeWhere and technology from Whisker Labs. Our three acquisitions to date, including Buoy Labs, put us at the forefront of whole home monitoring across the physical home networks of air, water, energy and security. The Resideo team is focused on executing our organic and inorganic growth strategies, as well as our cost reduction programs, as we continue to drive growth and long-term value creation for shareholders."

194.    On this news, the price of the Company's stock fell from $17.50 per share at market open on August 8, 2019, to $17.08 per share at the close of trading that day. The Company's stock price continued to decline to $16.45 per share at the close of trading on August 9, 2019, and then to $15.59 per share at the close of trading on August 12, 2019, the following trading day.

**_August 7, 2019 Form 10-Q_**

195.    Also on August 7, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Ragan and contained SOX certifications signed by Defendant Nefkens and Ragan attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████

196.    The 2Q19 10-Q stated the following regarding the Company's internal controls:

Our Chief Executive Officer and Chief Financial Officer, with the assistance of other members of our management, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period

covered by this Quarterly Report on Form 10-Q. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable assurance level as of the end of the period covered by this Quarterly Report on Form 10-Q.

* * *

There was no change in our internal control over financial reporting that occurred during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We have implemented, and continue to refine, internal controls and key system functionality to enable the preparation of financial information related to the new lease standard (ASU No. 2016-02) upon adoption on January 1, 2019. There were no significant changes to our internal control over financial reporting due to the adoption of the new lease standard.

197. The 2Q19 10-Q also provided that there had been no changes to the risk factors listed in the Company's 2018 10-K.

***August 8, 2019 Conference Call***

198. The next day, on August 8, 2019, the Company hosted a conference call with investors and analysts to discuss the Company's financial results for the second quarter of 2019. During the call, Defendant Nefkens reiterated the Company's guidance, and once again claimed that the Company had overcome supply chain issues and other problems stemming from the Spin-Off, stating the following, in relevant part:

Thanks, Michael, and good morning, everyone, and thank[s] for joining us on today's call. Resideo is now three quarters post the Honeywell spin, and I'm happy to report that we had another solid quarter. ***We are finally starting to see some normalcy after all the spin work, and we are pleased with the progress against our strategic initiatives.*** We settled into our new HQ in Austin, Texas, which enables us to have the leadership team in one location.

***Also, spin-related distractions are minimizing and the field teams have been able to go deep with our pro customers***. We've also been able to spend time with many new investors. ***But most important, our Q2 was strong, keeping us on track to hit our previously provided guidance for 2019***. So let's get right into it.

First, we'll update you on our overall results for the quarter. Then we'll discuss the results for each of our business segments. Third, I'll walk you through our progress

in the market and some of the exact acquisitions we've made to position us for growth acceleration. And last, we'll end with our financials and second half outlook.

Turning to Slide 3. For the second quarter, revenue came in at $1.242 billion, up year over year 4% on a GAAP basis and 6% on a non-GAAP cost and currency basis. From a top line perspective, we're pleased that growth has spread evenly across our two segments. Adjusted EBITDA after the Honeywell reimbursement payment came in at $81 million and $116 million excluding the reimbursement payment.

*A solid performance driven by a combination of top line growth and continued cost management*. Product mix headwinds around our new product launches continued but were partially offset via cost containment. Adjusted EPS was $0.19 per share and GAAP EPS was a loss of $0.09 per share due to tax effects related to the Honeywell reimbursement agreement. All in all, a solid quarter on both revenue and the EBITDA.

Now turning to Slide 4 and our segment performance. Revenue growth was spread evenly across our two segments. For our ADI Global Distribution business, we continue to see solid organic growth in the Americas and EMEA, driven by Security and Life Safety as well as expansion of the Professional A/V growth initiative. We added to our AD product offering announcing a distribution agreement with Samsung Pro, and we continue to win high-value new business throughout North America.

We're also pleased to report that ADI was recently highlighted in Security Systems News in addition to being recognized as the top distributor used by SDM Magazine's, SDM 100. Now turning to our Products & Solutions business. P&S reported mid-single-digit growth. Security had another solid growth quarter as we continue to take share resulting from the launch of our new Pro series platform.

In comfort, we saw strong volumes in the new T9 and T10 Pro connected thermostats. And in our RTS business, we launched a next-generation universal defrost control for heat pumps. We did see an in-quarter slowdown in the RTS OEM channel, in particular with our hot water heater OEM customers. Now driving harder on the organic side, we boosted our R&D spend as part of our previously announced strategic initiatives, and we expect to announce new product launches in water, comfort, air and security in the second half of the year.

On the inorganic front, we completed two acquisitions in the quarter, which I'll talk more about shortly. Looking at P&S segment adjusted EBITDA, both comfort and security are seeing margin pressures due to product mix headwinds, specifically the ramp up of our new security platform and lower margins on connected thermostats. We are working to offset these with cost containment and supply chain and sourcing process improvements. *I also want to call out the incredible strides we've made on improving our supply chain.*

*As you may know, we had some supply chain headwinds pre and post-spin. But due to new supply chain leadership and process changes, we're delivering more on time than ever before and our delivery metrics are the best they've been in five years.* This improvement will allow us to be more aggressive on the growth side.

(Emphasis added.)

199.   Also during the call, the following exchange took place between Defendant Nefkens and an analyst on the subject of the Company's product roll-outs during the upcoming fourth quarter of 2019:

> [Analyst]: This is Jeff Kessler at Imperial Capital. With regard to non-ADT business in the Pro market, what are the medium and some of the smaller -- but maybe let's shift into the medium regional companies asking for as you begin to change your product line and advance it in the fourth quarter. What are they asking for that is different or additive to what they have now to keep them -- to keep their value proposition up and higher than you might have to call off the new competition?
>
> [Defendant Nefkens]: Thanks, Jeff. This is Mike here. I'll answer that. So yes, so looking at security, *we will be rolling out our new Pro series platform to the general market in Q4.*
>
> So that in 2020, we'll be rolling that out in Europe. *So we have launched it with our largest customer, and we will be rolling it out to general market in Q4 and then into Europe next year.* The difference is on what this product does versus the previous generations of product. It is a fully modular product, meaning that it will eliminate the number of truck rolls that our dealers need to make as technology increase -- as technology changes.

(Emphasis added.)

*August 12, 2019 Oppenheimer Report*

200.   On August 12, 2019, an Oppenheimer analyst issued a report on the Company stating that "we are concerned with [Resideo's] margin profile over the next 2-3 years," and that "management also acknowledged there is a 'new normal' in security and margins should settle in 500 bps lower." The analyst also lowered the Company's price target to $20, down from $30.

201.    On this news, the price of the Company's stock fell from $15.59 per share at the close of trading on August 12, 2019, to $15.31 per share at the close of trading on August 13, 2019. The Company's stock price continued to decline to $14.64 per share at the close of trading on August 14, 2019.

*October 22, 2019 Press Releases*

202.    On October 22, 2019, the Company issued a press release disclosing its preliminary financial results for the fiscal quarter ended September 30, 2019. The press release announced disappointing results for the quarter, and revealed that the Company would be performing a "comprehensive operational and financial review" of its business, stating the following, in relevant part:

> ***Resideo has begun a comprehensive operational and financial review, focused on improving gross margins and optimizing its organizational footprint***. The aim of the review is to simplify internal processes that will enable Resideo to be more agile in responding to changing customer and marketplace dynamics. The company has retained industry-recognized experts in supply chain optimization and organizational excellence to assist in the review.
>
> The review will build upon the previously announced cost optimization program, which is on track to achieve approximately $15 million in realized savings in 2019 and $50 million in run-rate savings by the end of 2020. The new operational and financial review is expected to capture incremental gross margin and operating expense savings in 2020. We believe significant gross margin opportunity exists in Comfort and Security products through value engineering cost reductions. Resideo plans to provide a detailed report of planned actions, anticipated timelines, and progress made to date in conjunction with the announcement of its fourth-quarter and full-year 2019 financial results, expected in February 2020.
>
> "While I am disappointed in our preliminary results for the third quarter***, we remain confident in the fundamentals of our business***," said Mike Nefkens, president and CEO of Resideo. "The issues impacting our second-half 2019 results underscore the urgency to simplify our operations, reduce our cost structure, increase agility throughout the organization and drive adoption of our products in the professional, do-it-for-me channel where Resideo is a market leader. We are aggressively addressing challenges through a comprehensive operational and financial review of the company, with a particular focus on the Products & Solutions segment. ***We are***

> *targeting areas to drive improved financial performance and are confident we are pursuing the necessary changes to deliver superior shareholder value."*

(Emphasis added.)

203.    The press release also disclosed lower than expected EBITDA, as well as declining

revenue across several of the Company's business segments, stating the following:

> Resideo Technologies, Inc. (NYSE: REZI), a leading global provider of home comfort and security solutions, ***today announced that its adjusted EBITDA (non-GAAP) for the third quarter of 2019 is estimated to be approximately $77 million to $79 million. Revenue for the third quarter is anticipated to be $1.226 billion, representing a 2% growth rate year-over-year.***
>
> In the third quarter, the ADI Global Distribution business continued to grow as planned. The Products & Solutions segment experienced revenue decline in certain product families of the Comfort business and in its Residential Thermal Solutions (RTS) gas combustion business. ***We believe the RTS slowdown was driven by certain recent regulatory changes and a general slowdown across large OEM customers in the sector.***
>
> The Comfort business declines were primarily due to lower sales volumes in non-connected thermostats. ***We believe a poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line impacted the adoption of mid-level T-Series thermostats***. The cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued. The company is working with its channel partners to enhance and better position the T-Series and expects significant improvement in 2020.
>
> The company expects these headwinds to continue into the peak winter demand period, which is expected to reduce previously anticipated full-year 2019 Products & Solutions segment revenue by approximately $110 million. Approximately $66 million of this expected shortfall is from Comfort and $22 million from RTS, with the related gross margin and adjusted EBITDA impacts. While the Security business continues to grow, a single large new customer delayed the start date of its purchases beyond the fourth quarter, resulting in an expected negative impact on fourth-quarter revenue of approximately $22 million.
>
> The company's new generation security products and connected thermostats have experienced solid growth. ***However, with the transition, these products have yet to benefit from lifecycle value engineering, adversely impacting full-year 2019 Products & Solutions segment gross margins.*** The company is actively investing in its value engineering team and expects meaningful improvement to gross margins over the next 18 months.

(Emphasis added.)

204.    Concurrently with its earnings release, the Company also announced that Defendant Ragan would be resigning as the Company's CFO "to pursue other opportunities," and would be replaced by Ryder, who would become the Company's interim CFO effective November 7, 2019.

205.    On this news, the price of the Company's stock fell from $15.23 per share at the close of trading on October 22, 2019, to $9.50 per share at the close of trading on October 23, 2019, representing a loss in value of more than 37%.

206.    The statements referenced in ¶¶ 152-155, 157-159, 161-165, 172-187, 189, 191-193, 195-199, and 202-203 herein were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the negative impacts of the Spin-Off on Resideo were far more significant and pervasive than the Individual Defendants had disclosed, and the royalties and other payments the Company was required to make to Honeywell would significantly hamper the Company's ability to operate effectively and respond to challenges in the market; (2) the Company had virtually no value engineers, which would prevent the Company from effectively managing certain product costs; (3) the Company's supply chains and inventory were pervaded by serious problems, causing backorders and shortages; (4) the Company's T-Series thermostats and certain of its security systems made use of outdated technology and were becoming less relevant in the market; (5) the Company's TCC App was plagued by technical problems that reduced its effectiveness; (6) the Company failed to fulfill contractual obligations to certain of its OEM customers, resulting in contract penalties; (7) the Company had lost a significant amount of leverage and bargaining power that it had once been afforded as a part of Honeywell; (8) the Company suffered from fundamental governance and operational issues owing to its nature as a

fusion of largely unrelated business units without a shared history of operations; (9) the Company lacked the expertise or technology needed to redress the foregoing problems; (10) due to all of the foregoing, the Individual Defendants' representations regarding the Company's financial guidance, earnings, and overall prospects were misleading and lacked a reasonable basis in fact; and (11) the Company failed to maintain internal controls.  As a result of the foregoing, Resideo's public statements were materially false and misleading at all relevant times.

### **The Truth Fully Emerges**

207.    On November 6, 2019, the Company issued a press release confirming the disappointing financial results disclosed on October 22, 2019. The next day, on November 7, 2019, the Company held an earnings call to discuss its financial results for the third quarter of 2019. During the call, Defendant Nefkens revealed, for the first time, that the Company had virtually no value engineering teams since "[b]efore we spun off from Honeywell," and throughout the Relevant Period, stating the following:

> I mentioned in my opening remarks that we have identified the specific factors that impacted our 2019 EBITDA decline in products and solutions and are taking aggressive actions. Let me summarize those here. The first factor was gross margin compression. ***Most of our value engineering stopped prior to our spin-off from Honeywell.***
>
> In a company like ours, product costs like components, raw materials and packaging will need to be optimized every year to keep gross margin strong. Value engineering teams do that. ***Before we spun off from Honeywell, these teams were largely depleted, and we are seeing the effects of that in our gross margins***. Building back this capability as a top priority, and we expect to see the benefits starting in 2020.

(Emphasis added.)

208.    Defendant Nefkens further commented on the Company's lack of value engineering teams in response to an analyst's question as follows:

Yes, Jeff, and thanks for the question. This is Mike here. So look, I think the lines were drawn pre-spin sometime back about who was coming over and who wasn't. So not certain of exactly how those decisions were made.

And what I can tell you is that the talent and the value engineering that came over was very small compared to what was required. Our business is going through a transformation right now from products that are more mechanical into products that are more electronic. ***And we basically did not have the right people on the pitch post-spin to continue to value engineer those products***. One of the poor assumptions we made was that we have those capabilities and we have the right talent to drive those.

And I think we saw pretty quickly in Q3 that those teams were not making the right progress, and we had to make some pretty significant changes to go drive that. So we have begun that on three of our major lines of products. We already have new teams in place. ***As you alluded, the problem with that is really the value engineering that should have been done 12 to 24 months ago, we would have started to see the impact now.***

Now that we're restarting that, it will take some time as new raws, new materials, new components will have to come in, will have to be manufactured. ***We'll have to move all the previous stocks that we have before we start to see the benefit of that, and we expect that to take 12 to 24 months***. But I just want everyone on the line to know that for three of our major lines, we have new talent in place. Some of the external help that Bob referred to earlier is on the pitch as well helping us, and they have world-class expertise in this.

(Emphasis added.)

209.    Defendant Nefkens discussed additional factors that had impacted Resideo

following the Spin-Off, including problems with sourcing and slow-moving products as follows:

The second factor is sourcing. We lost some sourcing leverage in direct and indirect materials following the spin-off. We've been working with our suppliers for several months now to rectify that. The third factor is a margin drop associated with the competitive renewal of a contract from a large OEM security customer.

This contract was secured in 2017 and first deliveries began a year later, with volume ramp-up in 2019. Contractual customer rebates associated with this contract drove further margin decline this year. The fourth factor is the previously mentioned T-Series thermostat transition. This was a transition that began in 2017 from a high-margin product offering to more modern but lower-margin series.

The plan called for increased volumes to make up for the margin drop. This did not materialize, which was a clear planning and execution misstep. As mentioned, we

are working with our channel partners to improve the position of the T-Series line and expect improvement in 2020. Finally, post-spin inventory writedowns and slow-moving products impacted our EBITDA as well.

210.    On this news, the price of the Company's stock fell from $10.02 per share at the close of trading on November 6, 2019, to $9.78 per share at the close of trading on November 7, 2019, on heavy volume. The price of the Company's stock continued to drop over the next several trading days, falling to $9.60 per share at the close of trading on November 8, 2019, and finally settling at $8.77 per share at the close of trading on November 12, 2019.

211.    Not long after, on December 2, 2019, the Company announced that Defendant Nefkens would be resigning as CEO once a successor was appointed, purportedly to "focus on family issues."

**Subsequent Developments**

***December 11, 2019 Investor Update***

212.    On December 11, 2019, the Company published an "Investor Update" presentation on its website, discussing, among other things, the Company's performance in 2019, which the presentation conceded was "very disappointing." The presentation stated the following regarding the Company's "Post-Spin" prospects:

- Resideo opened trading on the first day as an independent company on October 29, 2018 at $28 per share

- The spin thesis was strong brand recognition, Pro Install channel and Home Install base, consistent ADI performance and leadership share in large and growing segments

- SpinCos often have teething pains due to legacy tie-ins, allocated pre-spin financials, management and customer turnover, TSA transitions and shareholder churn

- Resideo has additional complexity due to Honeywell determined spin obligations, lack of pre-existing stand-alone business and dramatic profitability shortfalls to estimates

- Performance has been disappointing in 2019, with commensurate stock market reaction

***December 11, 2019 Investor Conference***

213.    Also on December 11, 2019, the Company presented at the Imperial Capital 2019 Security Investor Conference. During the conference, Ryder, the Company's new CFO, divulged numerous pieces of information regarding the serious issues Resideo had been facing—and that the Individual Defendants had attempted to conceal—since the Company's inception. Ryder stated the following, in relevant part:

> I'm new here, just started about a month ago. ***My first official act was to bring down full year guidance by like 35%, so welcome to the NFL moment.***
>
> * * *
>
> A big thing was a lack of pre-existing standalone business . . . [e]ssentially, the whole Products & Solutions business was various businesses within divisions of Honeywell. And they kind of picked individual pieces up and kind of threw them together and called that Products & Solutions which we'll talk about. And that kind of had some governance ramifications.
>
> * * *
>
> We're going to make some pretty sizeable reductions in [selling, general and administrative expenses] to right-size the business for what we think new sales will be when we eliminate some of the [products] and maybe look at some of the geographies and make sure we have the right [selling, general and administrative expenses], ***because all this stuff came over from Honeywell, and was probably structured for a much bigger, more complex business. Which we no longer have.*** There is a lot of governance with a clear escalation path.

(Emphasis added.)

214.    In particular, Ryder detailed severe problems with the performance of the Company's products, the Company's manufacturing capabilities, and the Company's supply chain, contradicting many of the Individual Defendants' prior statements, stating the following:

> ***We've had new product introduction, execution issues, lack of customer acceptance testing***. And we are too slow to identify poor performing new product

launches, okay? Now all these new product introductions, obviously, this takes a while to get these things going.

\* \* \*

The portfolio is being adjusted to meet consumer needs, right? So there are a lot of these – most of this was driven by new product introductions. These were all developed probably a couple of years ago and launched kind of this year, ***not completely launched, right, but weren't really accepted by customers, weren't really competitive, probably some issues around previous products that were discontinued and new products that were put in.*** The customers actually like the old products better than new products. ***That's never a good thing. Maybe, they weren't so price competitive***, which is also never a good thing, which is leading to these kind of numbers.

\* \* \*

We had the inventory. ***And unfortunately, nobody wanted to buy it, which is why we had these inventory write-offs, okay?***

\* \* \*

We probably have too many [products], we might be in too many places. ***Maybe our manufacturing facilities aren't in the right places with the right freight lanes***. Maybe capacity utilization isn't where we would want to be.

(Emphasis added.)

215. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



216.

***February 26, 2020 Press Release***

217.     On February 26, 2020, the Company issued a press release disclosing its financial

results for the fiscal quarter and full year ended December 31, 2019. The press release revealed

relatively dismal fourth quarter and full year 2019 results, in stark contrast to the guidance

previously issued by the Individual Defendants, stating the following:

> Consolidated revenue increased 3% on a GAAP basis and 4% on a constant
> currency basis year-over-year. GAAP performance was driven by robust 10%
> growth in ADI partially offset by a 4% reduction in Products & Solutions. Adjusted
> EBITDA declined $34 million, or 25% year-over-year, driven by a 28% reduction
> in Products & Solutions partially offset by an 18% increase in ADI.
>
> Full-year consolidated revenue increased 3% on a GAAP basis and 5% on a
> constant currency basis. GAAP performance was driven by ADI revenue growth of
> 6% and flat revenues for Products & Solutions. Adjusted EBITDA declined
> $137 million, or 27%, driven by a 32% reduction in Products & Solutions partially
> offset by a 15% increase in ADI.
>
>                                    * * *
>
> ADI delivered consistently strong performance during 2019. The Products &
> Solutions business experienced a number of challenges during the year, particularly
> in the third and fourth quarters, that negatively impacted performance across its
> product lines.

*February 27, 2020 Conference Call*

218.    On February 27, 2020, the Company held a conference call with analysts and investors to discuss the Company's financial results issued the prior day. During the call, which was hosted by Ryder and Defendants Nefkens and Teich, Defendant Teich engaged in the following exchange with an analyst, revealing additional information contradicting the Individual Defendants' prior representations as to the post-Spin-Off problems the Company had been facing, including its lack of value engineers:

> [Analyst]: OK. Second question, with regard to -- ***one of the problems that the company encountered this past year was the lack of product development people who were critical in developing some of the newer, now perhaps slightly older products that you folks are selling did not come over from Honeywell***. From what I've seen and what I've talked to you, what we've seen in the company, it sounds like they've either gotten some people coming over from Honeywell or are you replenished some of the product development folks who were lost. Can you comment on what's going on there in terms of getting the people in place and then getting the products in place?

> [Defendant Teich]: ***So I agree with you, Jeff, that post-spin that there was an opportunity for talent improvement in the product development areas of P&S., and some of the lack of that was manifested in our results in 2019.*** So the problem has been identified. We've hired a new Products & Solutions President, Sach Sankpal, who's got a history with Honeywell and in some of these segments, so he knows a lot of the players there. And he's got a good eye for talent.

> And that's the most important thing, it's just to get the right talent in the right positions, and properly motivate them and direct them to focus on the right priorities from the R&D standpoint. And that's job No. 1 for Sach at this point. He's an experienced operator.

> And I'm confident that he's going to generate good results in that regard. It's a time-consuming process. It's not something that happens instantly. But I think it's most important that you have good talent that is well-selected and well-managed and working on the correct priorities, and that's what we're focused on.

(Emphasis added.)

## DAMAGES TO RESIDEO

219.   As a direct and proximate result of the Individual Defendants' misconduct, Resideo has lost and will continue to lose and expend many millions of dollars.

220.   On March 30, 2021, the Court in the Securities Class Action denied in full the defendants' motion to dismiss, holding that, "Plaintiffs' allegations demonstrate that any cautionary language was not meaningful because it contradicted Defendants' actual knowledge" and that "Plaintiffs have plausibly alleged that Defendants knew that material issues *existed* when Defendants disclosed that those material issues *might* occur."[5]   The Securities Class Action has required the Company to pay significant legal expenses for the defense of that case and exposed Resideo to substantial liability.  The Individual Defendants' breaches of fiduciary duty have also necessitated costly internal investigations and subjected the company to losses from the waste of corporate assets and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company.

221.   As a direct and proximate result of the Individual Defendants' conduct, Resideo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

222.   Plaintiffs bring this action derivatively and for the benefit of Resideo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

---

[5] *In re Resideo Technologies, Inc. Securities Litigation*, No. 19-cv-2863 (D. Minn. March 30, 2021), Dkt. No. 99, at 11.

fiduciary duties as directors and/or officers of Resideo, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

223.    Resideo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

224.    Plaintiffs are, and have been at all relevant times, shareholders of Resideo. Plaintiffs will adequately and fairly represent the interests of Resideo in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

225.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

226.    A pre-suit demand on the Board of Resideo is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following ten individuals: Defendants Deninger, Fradin, Lazar, Richardson, Teich, and Wienbar (the "Director-Defendants"), along with non-parties Jay Geldmacher, Cynthia Hostetler, Brian Kushner, and Kareem Yusuf (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

227.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

228.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

229.    Additional reasons that demand on Defendant Deninger is futile follow. Defendant Deninger has served as a Company director since 2018. He also serves as the Chair of the Company's Finance Committee, and as a member of the Audit Committee and the Innovation and Technology Committee. Defendant Deninger has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Deninger signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Deninger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

230.    Additional reasons that demand on Defendant Fradin is futile follow. Defendant Fradin has served as the Chairman of the Board since 2018. He also serves as a member of the Company's Finance Committee and the Innovation and Technology Committee. Defendant Fradin

has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fradin signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Fradin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.    Additional reasons that demand on Defendant Lazar is futile follow. Defendant Lazar has served as a Company director since 2018. He also serves as the Chair of the Company's Audit Committee, and as a member of the Innovation and Technology Committee and the Strategic & Operational Committee. Defendant Lazar has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lazar signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Lazar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.    Additional reasons that demand on Defendant Richardson is futile follow. Defendant Richardson has served as a Company director since 2018. She also serves as the Chair of the Company's Nominating and Governance Committee, and as a member of the Compensation

Committee and the Strategic & Operational Committee. Defendant Richardson has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Richardson signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Richardson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

233.    Additional reasons that demand on Defendant Teich is futile follow. Defendant Teich has served as the Company's lead independent director since 2018. He also serves as the Chair of the Company's Innovation and Technology Committee and the Strategic & Operational Committee, and as a member of the Compensation Committee, the Finance Committee, and the Nominating and Governance Committee. Defendant Teich has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. During the Company's conference call held on February 27, 2020, Defendant Teich indicated his awareness of the Company's lack of value engineers following the Spin-Off, further demonstrating his complicity in the scheme to conceal material information from the market. Furthermore, Defendant Teich signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Teich breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

234.     Additional reasons that demand on Defendant Wienbar is futile follow. Defendant Wienbar has served as a Company director since 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. Defendant Wienbar has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Wienbar signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Wienbar breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

235.     Additional reasons that demand on the Board is futile follow.

236.     The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, prior to the Spin-Off, Defendants Nefkens, Ragan, and Fradin each served in various senior roles at Honeywell during the same period of time, including as CEO of Honeywell's Homes Business, as CFO of Honeywell Homes, and as vice chairman of Honeywell, respectively. Additionally, between January 2014 and February 2015, Defendants Lazar and Richardson served as CFO and COO, respectively, at GoPro, Inc. These conflicts of interest precluded the Director-Defendants from adequately monitoring the

Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

237.    Defendants Deninger, Lazar, and Wienbar (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements with the SEC. ██████████████████████████████ Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

238.    Additionally, all of the Director Defendants were aware of non-public information in presentations made to the Board, and various committees of the Board, discussed in greater detail in ¶¶ 102-03, 115-16, 149, 166-67, 188, and 215-16.  Yet the Director Defendants allowed the Company to issue false and misleading statements, exposing the Company to liability in the Securities Class Action.

239.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the

Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

240. Resideo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Resideo any part of the damages Resideo suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

241. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

242. The acts complained of herein constitute violations of fiduciary duties owed by Resideo's officers and directors, and these acts are incapable of ratification.

243. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Resideo. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Resideo, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

244.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Resideo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

245.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

246.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

247.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The

Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

248.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

249.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

250.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the negative impacts of the Spin-Off on Resideo were far more significant and pervasive than the Individual Defendants had disclosed, and the royalties and other payments the Company was required to make to Honeywell would significantly hamper the Company's ability to operate effectively and respond to challenges in the market; (2) the Company had virtually no value engineers, which would prevent the Company from effectively managing certain product costs; (3) the Company's supply chains and inventory were pervaded by serious problems, causing backorders and shortages; (4) the Company's T-Series thermostats and certain

of its security systems made use of outdated technology and were becoming less relevant in the market; (5) the Company's TCC App was plagued by technical problems that reduced its effectiveness; (6) the Company failed to fulfill contractual obligations to certain of its OEM customers, resulting in contract penalties; (7) the Company had lost a significant amount of leverage and bargaining power that it had once been afforded as a part of Honeywell; (8) the Company suffered from fundamental governance and operational issues owing to its nature as a fusion of largely unrelated business units without a shared history of operations; (9) the Company lacked the expertise or technology needed to redress the foregoing problems; (10) due to all of the foregoing, the Individual Defendants' representations regarding the Company's financial guidance, earnings, and overall prospects were misleading and lacked a reasonable basis in fact; and (11) the Company failed to maintain internal controls.  As a result of the foregoing, Resideo's public statements were materially false and misleading at all relevant times.

251.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

252.    Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

253.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including election of directors, appointment of an independent auditor, an advisory vote to approve executive compensation, and an advisory vote on the frequency of future advisory votes to approve executive compensation.

254.     The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Nefkens, Deninger, and Wienbar, which allowed them to continue breaching their fiduciary duties to Resideo.

255.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

256.     Plaintiffs on behalf of Resideo have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

257.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

258.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Resideo's business and affairs.

259.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

260.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Resideo.

261.    In breach of their fiduciary duties owed to Resideo, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the negative impacts of the Spin-Off on Resideo were far more significant and pervasive than the Individual Defendants had disclosed, and the royalties and other payments the Company was required to make to Honeywell would significantly hamper the Company's ability to operate effectively and respond to challenges in the market; (2) the Company had virtually no value engineers, which would prevent the Company from effectively managing certain product costs; (3) the Company's supply chains and inventory were pervaded by serious problems, causing backorders and shortages; (4) the Company's T-Series thermostats and certain of its security systems made use of outdated technology and were becoming less relevant in the market; (5) the Company's TCC App was plagued by technical problems that reduced its effectiveness; (6) the Company failed to fulfill contractual obligations to certain of its OEM customers, resulting in contract penalties; (7) the Company had lost a significant amount of leverage and bargaining power that it had once been afforded as a part of Honeywell; (8) the Company suffered from fundamental governance and operational issues owing to its nature as a fusion of largely unrelated business units without a shared history of operations; (9) the Company lacked the expertise or technology needed to redress the foregoing problems; (10) due to all of the foregoing, the Individual Defendants' representations regarding the Company's financial guidance, earnings, and overall prospects were misleading and lacked a reasonable basis in fact; and (11) the Company failed to maintain internal controls.  As a

result of the foregoing, Resideo's public statements were materially false and misleading at all relevant times.

262.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

263.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

264.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Resideo's securities.

265.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Resideo's securities.

The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

266.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

267.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Resideo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

268.    Plaintiffs on behalf of Resideo have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

269.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

270.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Resideo.

271.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Resideo that was tied to the performance or artificially inflated valuation of Resideo, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

272.    Plaintiffs, as shareholders and representatives of Resideo, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

273.    Plaintiffs on behalf of Resideo have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

274.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

275.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Resideo, for which they are legally responsible.

276.    As a direct and proximate result of the Individual Defendants' abuse of control, Resideo has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

277.    Plaintiffs on behalf of Resideo have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

278.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

279.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Resideo in a manner consistent with the operations of a publicly-held corporation.

280.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Resideo has sustained and will continue to sustain significant damages.

281.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

282.    Plaintiffs on behalf of Resideo have no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

283.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

284.    The Individual Defendants caused the Company to pay themselves excessive salaries and fees, to the detriment of the shareholders and the Company.

285.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Resideo to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

286.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

287.    Plaintiffs on behalf of Resideo have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Resideo, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Resideo;

(c)    Determining and awarding to Resideo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally,

together with pre-judgment and post-judgment interest thereon;

        (d)    Directing Resideo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Resideo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        2. a provision to permit the shareholders of Resideo to nominate at least five candidates for election to the Board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

        (e)    Awarding Resideo restitution from Individual Defendants, and each of them;

        (f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)    Granting such other and further relief as the Court may deem just and proper.

    Plaintiffs hereby demand a trial by jury.

Dated: September 1, 2021

Respectfully submitted,

**REINHARDT WENDORF & BLANCHFIELD**

*/s/ Garrett D. Blanchfield*
Garrett D. Blanchfield, Jr. (#209855)
Brant D. Penney (#316878)
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
Email: g.blanchfield@rwblawfirm.com
Email: b.penney@rwblawfirm.com

*Local counsel for Plaintiff*

**SAXENA WHITE P.A.**

Maya Saxena
Joseph E. White III
Adam Warden
7777 Glades Road
Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Email: msaxena@saxenawhite.com
Email: jwhite@saxenawhite.com
Email: awarden@saxenawhite.com

**GRANT & EISENHOFER PA**

Michael J. Barry
Vivek Upadhya
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Email: mbarry@gelaw.com
Email: vupadhya@gelaw.com

*Attorneys for Plaintiff Riviera Beach Police Pension Fund*

**SAXENA WHITE P.A.**

Thomas Curry
1000 N West Street
Suite 1200
Wilmington, DE 19801
Tel. 302.485.0483
Email: tcurry@saxenawhite.com

*Attorneys for Plaintiff City of Hialeah Employees Retirement System*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue
40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**FARNAN LLP**

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165) 919 N. Market St., 12th Floor Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

**THE BROWN LAW FIRM, P.C.**

Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net


*Additional counsel for Plaintiffs*

**LEVI & KORSINSKY, LLP**

Gregory M. Nespole
Ryan Messina
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: gnespole@zlk.com
Email: rmessina@zlk.com

## VERIFICATION

I, Michael Brown, being duly sworn, declare as follows:

I am the Chairman of the Riviera Beach Police Pension Fund ("Riviera Beach PPF" or "Plaintiff") and am authorized to act on its behalf. Riviera Beach PPF is a shareholder of Resideo Technologies, Inc. ("Resideo" or the "Company") and has been throughout the relevant period defined in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). Riviera Beach PPF has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: August __, 2021

_____ 9-1-21

Michael Brown, Chairman
Riviera Beach Police Pension Fund

## VERIFICATION

I, Robert Williams III, being duly sworn, declare as follows:

I am the Chairperson of the City of Hialeah Employees Retirement System ("City of Hialeah ERS" or "Plaintiff") and am authorized to act on its behalf. City of Hialeah ERS is a shareholder of Resideo Technologies, Inc. ("Resideo" or the "Company") and has been throughout the relevant period defined in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). City of Hialeah ERS has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Signed and Accepted:


Dated: August _17_, 2021

_Robert Williams III_
Robert Williams III
Chairperson
City of Hialeah Employees
Retirement System